Fairfield Savings and Loan Association, etc., Plaintiff, v. Harriet Kroll, et al., Defendants.

Harriet Kroll, Cross-Plaintiff and Third-Party Plaintiff-Appellee, v. Anna Vitello, et al., Defendants, Sam Mormino, Cross-Defendant and Third-Party Defendant-Appellant.

Gen. No. 52,757.

First District.

February 24, 1969.

Rehearing denied April 7, 1969.

L. Louis Karton, of Chicago, for appellant.

Simon & Ingram, of Chicago (John D. Ingram and Robert B. Simon, of counsel), for appellee.

ALLOY, P. J.
The cause before us originated as a foreclosure action on a mortgage to Fairfield Savings and Loan Asso-

ciation (hereinafter called "Fairfield") against Harriet Kroll, a defendant, and cross-plaintiff in the third-party action. The third-party complaint sought damages on the basis of the contention that Harriet Kroll was defrauded in connection with her purchase of the real estate being foreclosed and through the activities of defendant, Sam Mormino, in obtaining such mortgage on the property and in the conduct of the transaction.

Plaintiff Kroll noted a three-apartment frame building for sale on January 19, 1964. The realtor was listed as Top Realty Company which was owned and operated by defendant, Sam Mormino. Harriet Kroll then entered into a contract through the real estate broker, Mormino, with the owners of the building. The sale price of the building was $23,500 and the pertinent provision in the contract provided specifically that it was contingent on the ability of the buyer or Top Realty Co. to secure a first mortgage in the sum of $15,000 payable over a 15-year period at an interest rate of 6% per annum within 45 days from the date of the contract. The mortgage commission was not to exceed 2%. It further provided, if the buyers or the realty company failed to secure the mortgage within the 45-day period, that the contract was to be void and the earnest money was to be refunded to the buyer. Plaintiff Kroll paid a down payment of $2,000 to Mormino. The record shows that Mormino attempted to obtain a mortgage for plaintiff Kroll by sending her to Liberty Savings and Loan Company, and also through the owners to see if the owners would accept a mortgage from the purchaser in connection with the sale. By April 11, 1964, neither Harriet Kroll nor Mormino was able to obtain a mortgage for her on the property. On such date, the contract was marked cancelled by Mormino, but Mormino noted that there was a 45-day extension of time within which to obtain a mortgage although the owners appear from the record never to have consented to such extension by Mormino.

An Edward Lesiak testified that he was in the Mormino Realty Office when plaintiff Kroll was present and that Mormino introduced her to him. He stated that he would help her get a loan and testified that he gave her his business card. He also testified that he received a call from her and that she wanted him to get her a loan which he did by purchasing the property himself and obtained a loan with Fairfield Savings and Loan. Mormino denied that he introduced Lesiak to plaintiff Kroll and denied any contact at all with Lesiak with regard to the purchase and loan at Fairfield. There was evidence, however, that Mormino and Lesiak were friends and Mormino had referred some insurance business to Lesiak. Lesiak was in the insurance business. Plaintiff Kroll testified that she had never met Lesiak and knew nothing about any loan he obtained for her and that the first time she even knew of the transaction with Fairfield was when she received a loan payment book in the mail, the loan book being made out to Edward Lesiak.

The record discloses that plaintiff Kroll testified that Mormino had told her he would get someone to sign for the mortgage. He then requested that she bring him an additional $6,000, which she did, making a total payment of $8,000. It appears from the record that Lesiak applied for a loan on the property at Fairfield of $15,500. With the $8,000 which Harriet Kroll was going to pay, this would make the purchase price of $23,500. Harriet Kroll was not involved in the loan proceedings in any way. She was not present at the closing of the purchase of the property. The sellers along with the Lesiaks and Mormino were present at the closing. Sellers were represented by an attorney as were the Lesiaks. An attorney named Raszus was also present and stated that Mormino had called him to represent Harriet Kroll. The attorney said he talked with Harriet Kroll on the telephone about the transaction but plaintiff Kroll de-

299

nied ever talking with Raszus on the telephone or paying him for representing her. She did testify that Mormino took her to meet Raszus, but she did not ask him to represent her. At the closing at the loan company, a warranty deed was given from the owners to Edward Lesiak, and Edward Lesiak and wife then signed a $15,500 mortgage with Fairfield. Plaintiff Kroll was not present, but later she was sent a quitclaim deed from the Lesiaks, a title policy showing title insured in the Lesiaks, and still later she was mailed a payment book from Fairfield, also in the name of Edward Lesiak. No assignment of any of the leases in the building was made or given to her. It appears from the record that no one explained to plaintiff Kroll the mechanics of the transaction. After Miss Kroll had paid the additional $6,000 for the down payment she was told by Mormino that she could move into the apartment building. This was done in June or July, 1964. Harriet Kroll stayed there until September of 1964, and collected rent during that period. In September of 1964 she left on a trip to Europe advising the previous owner, then living in the apartment house, that if there were any problems such tenant should get in touch with plaintiff Kroll's brother.

Plaintiff Kroll had never made any payments on the loan as she contended she had no payment book in her own name and wanted one in her own name before she would make any payments. While plaintiff Kroll was gone, the electric power was shut off and several pipes froze before Harriet Kroll returned. Following her return she was informed by Fairfield that they were going to foreclose. An attempt was made to sell the property without success. In conjunction with the foreclosure action, as indicated previously, plaintiff Kroll filed a third-party action naming the previous owners, Mormino and Lesiak as defendants and in such action sought damages against them for fraud in the purchase and mortgage transaction. It appears from the record that

300

Lesiak had filed a voluntary petition in bankruptcy. The previous owner of the property and Fairfield were removed from the third-party action for fraud on a motion to strike and dismiss the complaint. Following hearing in the cause, the judgment for $8,497.80 was entered against Mormino and Edward Lesiak. This figure was determined by adding, to the $8,000 which Harriet Kroll had delivered to Mormino, interest at the rate of 5% from the date of the purchase with rents which Miss Kroll had received deducted from the total amount, and also the amount of the fair rental value of the apartment which Harriet Kroll had occupied was also deducted. Of particular significance, the record disclosed that during this time, Harriet Kroll was hard of hearing, confused and sometimes incoherent.

Defendant in the cross-complaint, Mormino, has appealed to this Court and asserts (1) that the third-party complaint does not state a cause of action as against him; (2) that the court erred in denying the motions to strike and dismiss for summary judgment and for a finding in Mormino's favor at the close of the evidence; (3) that the evidence in the record fails to show that the third-party plaintiff suffered any injury or damage to support the decree and that, if it does, the finding against Mormino for more than the broker's commission was improper; (4) that the chancellor erred in permitting the third-party plaintiff to produce evidence of her mental capacity; and (5) that there was no clear and convincing evidence that defendant Mormino was guilty of the alleged conspiracy to cheat and defraud plaintiff Kroll.

The cases in this State make no precise definition of what constitutes fraud but rely upon a general definition of fraud as related to particular facts. In Illinois Minerals Co. v. McCarty, 318 Ill App 423, at 434–5, 48 NE2d 424, the court, in considering what would constitute fraud stated:

301

"Acts which may constitute fraud extend to every possible case in which a fiduciary relationship exists. It may be moral, social or business. The rule embraces those informal relations which exists when one man trusts and relies upon another. The relationship of principal and agent is a familiar instance in which the principal of fiduciary relationship applies, in the strictest sense. Fraud may be based on false representation. It may be based on concealment; on fraudulent devises; on a wilful, malevolent act directed to perpetrate a wrong to the rights of others; unlawful appropriation of another's property by design, or conduct that operates fraudulently on the rights of others, and is so intended. In short, it comprises all acts, of omissions and concealments, including breach of legal or equitable duty, trust or confidence, resulting in injury to another. Deceit is a species of fraud. Sometimes the words are used interchangeably."

As stated in Citizens Savings & Loan Ass'n v. Fischer, 67 IllApp2d 315, at 322, 214 NE2d 612:

"There is no general rule for determining what facts will constitute fraud; whether or not it is found depends upon the special facts of each particular case. Majewski v. Gallina, 17 Ill2d 92, 160 NE2d 783. Fraud includes anything calculated to deceive, whether it be a single act or combination of circumstances, whether suppression of truth or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence, or by word of mouth or by look and gesture."

The complaint filed by plaintiff, Kroll, in the instant case is quite detailed and outlines numerous instances of what could well amount to fraud. It does not merely list general conclusions but sets forth specific facts such as dates, activities and conversations which allege the

302

existence of fraudulent conduct. It specifically alleges that defendant, unable to get a mortgage for plaintiff called for by the agreement which defendant himself prepared, contrived a scheme whereby he took $8,000 of plaintiff's money and intentionally arranged for Lesiak, a codefendant, to masquerade as the purchaser and mortgagor of the property in question. It alleges that as a result of this scheme, plaintiff Kroll lost her $8,000 and received a quitclaim deed, not a warranty deed, a title policy showing title in someone else's name, no mortgage in her name (with the consequent lack of the relationship to the lending institution), no leases or assignments or bill of sale for any personalty involved (both called for by the terms of the contract).

Mormino contends that he was merely acting as the agent for the seller and thus stood in no fiduciary relationship to Harriet Kroll. The record in the case, however, shows that Mormino undertook to obtain a mortgage for Harriet Kroll and assist her in financing the purchase. In view of her inability to readily understand such matters, when he did this, he became an agent for Harriet Kroll and thus stood in a fiduciary relationship to her. While he contended that he had nothing to do with obtaining the mortgage for Harriet Kroll, there is evidence that he contacted the seller about taking a mortgage back and, also, evidence that he worked with Lesiak and Fairfield to obtain a loan on the premises. Mormino obviously had a duty to reveal to plaintiff Harriet Kroll all aspects of the transaction and to see that she was informed about the purchase of the apartment building and the financing. This duty became even more significant in the case before us because of the confused mental state of Harriet Kroll. It is apparent from the record that Harriet Kroll was not familiar with real estate purchases and was the type of person who was easily confused in business matters. The testimony indicates that Mormino was aware of this condition. As a consequence,

Mormino should have been particularly careful and solicitous to the end that Harriet Kroll was completely informed of everything that was going on and so that she would be advised of the time of closing, the type of deed she would receive, how the payments were to be made on the mortgage and all other matters reasonably relating to the transaction. Mormino should also have advised her of the significance and importance of having an attorney represent her at the closing if there was any question in her mind as to the legal effect of the transaction.

The record shows that Mormino did not inform plaintiff Harriet Kroll of the fact that Lesiak was going to take title in Lesiak's name and obtain the mortgage in such name at Fairfield and then quitclaim the property to Kroll. There is no evidence to show that Mormino or anyone informed Harriet Kroll of this procedure or obtained her consent to proceed in this manner. Mormino did not make arrangements to have Harriet Kroll at the closing at Fairfield. She should have been present at the transaction with an attorney to fully inform her of her obligations. This failure by Mormino was taken by the court as a strong indication that Mormino wished to conceal the true facts from Harriet Kroll when in fact he had a duty to reveal them to her. The circumstance that Mormino had attorney Raszus present at the closing presumably to represent Harriet Kroll (when in fact Raszus was not hired by Harriet Kroll) was taken by the court as a further indication that Mormino was attempting to conceal the true facts of the purchase from Harriet Kroll. Raszus was later paid by Mormino. Mormino knew that Harriet Kroll was confused in business matters and he should have made it clear to her that she should be present at the closing and represented by an attorney of her choice.

The evidence shows that Harriet Kroll was relying on Mormino to see that she was protected in connection

with the purchase. Mormino failed to obtain a title insurance policy insuring title to the apartment building in Harriet Kroll's name, even though she was relying on him to see that she received such policy. Mormino also failed to see that leases on the apartment were assigned to Harriet Kroll. The record indicated that the failure to obtain the leases may have led to further damage to the building, since two tenants moved out while Harriet Kroll was away during September, October and November of 1964. Mormino also failed to notify Fairfield Savings and Loan that Harriet Kroll was the party who was actually making the purchase and that Harriet Kroll was going to be responsible for making the loan payments. Mormino likewise failed to notify Harriet Kroll that it was Fairfield that was the loan company involved. Harriet Kroll testified that the first time she heard about Fairfield Savings was when she received the Fairfield Savings Loan payment book with Lesiak's name on it. There is evidence that Mormino told Harriet Kroll that she was the owner of the property and could move in after the closing on June 5, 1964. She was not present at the closing. The quitclaim deed from the Lesiaks to Harriet Kroll was not notarized until June 29, 1964, and was not recorded until July 23, 1964. Harriet Kroll did not receive the quitclaim deed until sometime thereafter.

██ ██ If Harriet Kroll had been a knowledgeable participant in the transaction, then the trial court's conclusion would not have been justified. We cannot say, in view of the combination of all the facts and circumstances coupled with a knowledge of Harriet Kroll's inability to understand real estate transactions, as shown by the record, that the trial court was not justified in finding the existence of a fiduciary relationship and a failure of Mormino to inform Harriet Kroll of pertinent facts relating to the transaction. The foreclosure and loss stem largely from the mortgage arrangement involving Lesiak and Miss Kroll's inability to understand

305

her rights and responsibilities. Such evidence supports the finding of the court on the question of fraud.

██ ██ The trial court in making the finding of damages, concluded that Harriet Kroll was entitled to a return of her $8,000 which she paid as a down payment and adjusted this figure further for rents received and the reasonable value of the rent used by Harriet Kroll and the utilities paid by her. The trial court also allowed Harriet Kroll 5% interest on her $8,000 from the date the sale was concluded. The measure of damages which results from fraud of a defendant should not be the gain received by defendant, but rather the injury to plaintiff (Lickus v. O'Donnell, 321 Ill App 144, 147–8, 52 NE2d 271; Horne v. Walton, 117 Ill 141, 145, 7 NE 103). On the basis of the record before us, we cannot say that the court was wrong in finding that damage accrued to Harriet Kroll by reason of the conduct of Mormino and Lesiak. If Mormino had fulfilled his duty to Harriet Kroll and properly informed her what was going on she would have known who her loan was obtained from, would have known when the leases expired and, presumably, would have made payments on the loan. She presumably also would have taken steps to manage her property. Harriet Kroll, according to the record, became confused when she received a loan payment book showing a loan in someone else's name with no explanation from her agent Mormino. It is quite possible she felt that she was not clearly the owner of the property, and, since the loan books were in another name, she did not make loan payments since the payment book did not list her name as the obligor.

██ The respective ability, capability and degree of understanding of Harriet Kroll in relationship to Mormino and the degree of trust reposed in Mormino by Harriet Kroll, as related to the agreement of the parties and all of the testimony, was properly received by the court. The court likewise had the benefit of testimony of an-

306

other person well acquainted with Harriet Kroll who testified that at the time of this transaction Harriet Kroll was confused and incoherent and that Harriet Kroll had suffered a nervous breakdown in 1952, which apparently had a continuing effect on her. As stated in Hinkley v. Wynkoop, 305 Ill 115, 122–3, 137 NE 154:

> "Where mental weakness of one party to a transaction, not of itself sufficient to destroy capacity, is accompanied by undue influence, inadequacy of price, advantage taken of pecuniary necessities, ignorance and want of advice, misrepresentations or concealment, and the like, a contract or conveyance procured under such combined conditions will be defeated or set aside. It is not simply a presumption of invalidity which thus arises, but the presumption has become established. (2 Pomeroy's Eq Jur § 947, note 3.) The court was warranted in holding the transaction in question fraudulent, and that appellee is entitled to be relieved of the unconscionable contract or to be reimbursed for her damages if she has to assume the burden of the contract."

The trial court had the benefit of observing all of the parties in this cause. As we have stated on numerous occasions, the reviewing court will not substitute its judgment for that of the trial judge who has the advantage of seeing and hearing the witnesses in open court. The decision of the trial court should be sustained when supported by evidence. On the basis of the record before us we must, therefore, conclude that the judgment of the Circuit Court of Cook County should be affirmed.

Affirmed.

STOUDER and CULBERTSON, JJ., concur.