THE PEOPLE *ex rel.* WILLIAM J. SCOTT, Attorney General, Plaintiff-Appellee, *v.* POLICE HALL OF FAME, INC., *et al.*, Defendants and Third-Party Plaintiffs-Appellants.—(PATRICK J. GORMAN *et al.*, Defendants-Appellants and Third-Party Defendants-Appellees.)

First District (3rd Division)   No. 77-65

Opinion filed April 26, 1978.—Rehearing denied June 7, 1978.

Clyde O. Bowles, Jr., of Bowles & Ward, of Chicago (Stephen B. Ives, Jr., Stephen M. Truitt, and Wald, Harkrader & Ross, of counsel), for appellants Patrick J. Gorman *et al.*

William J. Scott, Attorney General, of Chicago (Donald G. Mulack and Robert D. Ericsson, Assistant Attorneys General, of counsel), for appellee, *pro se.*

Francis D. Morrissey, of Chicago, for *amicus curiae* Association of Direct Marketing Agencies.

Edward G. Coleman, of Springfield, for *amicus curiae* Super's Lodge No. 41 Fraternal Order of Police.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

The Attorney General of Illinois brought this action seeking injunctive relief and an accounting from two charitable organizations, their officers, corporate fund raisers, and certain individual shareholders of the fund-raising corporations who had solicited donations for charities in Illinois as part of a nationwide mail campaign. The trial court dismissed the action against the defendant charities and their officers. The fund raisers have appealed from the trial court's order which enjoined them from future solicitation of funds in Illinois and which required them to pay the State $417,928 in compensatory damages and $150,000 in punitive damages. The charities have appealed from that portion of the order which dismissed their third-party complaint against the fund raisers seeking reimbursement for attorney's fees incurred in defense of this action.

Police Hall of Fame, Inc. (hereinafter "PHF"), is a Florida not-for-profit corporation whose stated purpose is to provide financial assistance to widows and orphan children of slain enforcement officers, to develop scholarships, and to educate the public concerning police problems. Defendant National Police Officers Association of America (hereinafter

NPOA), a PHF affiliate, is a Florida based organization whose membership consists of law enforcement officers in active service.

In 1971, PHF and NPOA contracted with National Emblem Products (not a party to this action) to solicit contributions from the public by mail. The contract provided that contributions mailed to the charities' bank in Florida were to be divided between National Emblem and the charities. Seventy-five percent was allotted to National Emblem and 25 percent was allotted to the charities. National Emblem conducted campaigns which yielded $180,000 representing total contributions made by approximately 31,000 persons.

In 1972, the executive director of PHF and NPOA, Frank Schira, met with Patrick and Martin Gorman to discuss Helix, Inc., becoming the charities' new direct mail consultant. Helix's business included advising charities wishing to solicit funds by mail. Helix develops formats of solicitation and selects lists of names of possible contributors. Helix also oversees rental of lists for the mail campaign. The majority of stock in Helix is owned by Martin and Patrick Gorman who serve as corporate officers and directors.

On October 3, 1972, Helix purchased from National Emblem the house list consisting of the names and addresses of persons who had contributed to PHF and NPOA. On November 1, 1972, Helix contracted with the charities to provide direct mailing consulting services. The services would be provided upon advance notice by the charities. Helix would be paid the costs of conducting a national fund-raising and publicity campaign for the charities, Helix being entitled to up to 75 percent of contributions received. If costs exceeded 75 percent, Helix was to absorb cost overages. Helix was allowed to use its own lists of prior contributors in other campaigns and to charge the charities for the lists at public advertised rates. The contract allowed Helix to rent lists from third parties and to collect commissions in such transactions provided that the commissions did not result in additional costs for the charities. The list of persons responding to the campaign was to be the joint property of the charities and Helix.

On January 1, 1973, Washington Information Services, Inc. (hereinafter "WIS") entered into a three-year agreement with the charities to handle the printing and mailing of their literature. WIS is also a Washington, D.C., for-profit corporation and the majority of its stock is owned by Patrick and Martin Gorman. The cost to the charities was not to exceed 18.5 cents per printed package. WIS possessed the sole right to rent, exchange, or otherwise use those names for its own purposes as long as it scheduled mailings so as not to conflict with mailings conducted on behalf of the charities. The charities were given approval rights of all materials prior to printing and mailing. All supplier invoices, including those of

WIS, constituted a first claim against the charities' accounts and payments were due within 10 days of the invoice date.

Pursuant to the contract with WIS, over 800,000 pieces of mail were sent to prospective donors in March and April 1973. "Outside" lists were utilized, using names of contributors to causes other than PHF and NPOA. Beginning in January 1973, all appeal letters sent out under the aegis of NPOA bore the following notation: "Established in 1955." In March 1973, the description was changed to the following: "Chartered in Illinois, 1955." Those words appeared on more than one million pieces mailed to prospective donors in 1973. The NPOA which was chartered in Illinois subsequently was dissolved on December 22, 1969.

By April 1973, as a result of disagreements with the fund raisers, the charities postponed a decision regarding additional fund-raising campaigns. The charities retained a Dr. Nichols as a special consultant to act as liaison between the charities and the fund raisers. By letter the charities informed Martin Gorman that the next campaign would be delayed pending resolution of questions which Nichols would present.

On May 1, 1973, WIS informed the charities that forms for approximately three million letters at a cost of $210,000 previously had been ordered. On May 8, 1973, Nichols met in Michigan with representatives of WIS. The parties entered into a new agreement whereby all prior contracts were cancelled. The agreement included a schedule for primary mailings and the postage required thereupon. Some mailings were to be conducted in early May 1973, at a postage cost of $5,440. During the week of May 28, 1973, nearly two million pieces requiring $31,500 in postage were scheduled for mailing. On May 14, Schira issued a check for the earlier mailing. On June 1, 1973, Schira advanced $31,535 for the larger mailing postage. At trial Schira insisted only the mailings conducted prior to April 1973 had been authorized by the charities.

Of the over three million pieces mailed during the May-June 1973 campaign, the vast majority were called "Safety Tips" letters. This type letter first had been mailed to prospective donors in December 1972. Included in the "Tips" letter was the following:

"So a large part of the funds we receive from good, law-abiding citizens like you help us continue this urgent campaign to inform and gain the vitally needed support of more and more Americans."

Enclosed in the "Tips" letter was a contribution card which stated:

"Here's my gift * * * to help reach and gain the support of more concerned citizens * * * so you can continue and expand your vital police aid and public information programs."

In the agreement entered into May 8, 1973, it was provided that all

disputes between the parties were subject to arbitration under rules of the American Arbitration Association. In July 1973, pursuant to directions issued by the charities, WIS ceased all mailings. It then demanded payment for bills which had accrued. Thereafter WIS invoked the arbitration clause of the agreement, requesting a determination as to the amount owed.

Prior to arbitration, representatives of the charities met with Patrick Gorman and his counsel on September 10, 1973, in Arlington Heights, Illinois. At the meeting, the parties entered into a termination agreement whereby the charities paid WIS $135,000 and agreed to conduct two mailings to generate funds to pay other outstanding WIS bills. The charities themselves conducted mailings which resulted in $10,000 profits. According to WIS, it received none of the proceeds of these mailings.

On December 26, 1973, NPOA and PHF filed suit in Kentucky against Helix and WIS. The action was removed to the Federal court. The complaint charged that defendants had failed to conduct two mailings in the fall of 1973 which would have netted $700,000 in donations for the charities, and that defendants had used NPOA's name without authorization. The charities sought damages for unjust enrichment through defendants' conversion and control over the list of donors to PHF's fund appeals. The district court stayed the proceedings pending the outcome of arbitration.

The arbitration between the charities and WIS and Helix was conducted in Georgia. At the time of arbitration WIS and Helix had billed the charities $615,452 of which $476,242 had been paid. The arbitrator awarded WIS and Helix $24,585, and the award was confirmed by the United States District Court in Georgia. In June 1976 the charities paid WIS and Helix $20,120 in satisfaction of that award. On December 15, 1975, the district court in Kentucky granted WIS and Helix's motion for summary judgment and dismissed the action brought by the charities. This was predicated on the fact that the Georgia proceedings rendered the Kentucky issues *res judicata.*

Prior to 1973, donors sent all contributions directly to the charities' Florida bank where the donations were tabulated and deposited into a special account. Schira had authority to withdraw money from this account subject to bank approval and to Helix's first claim on account. Beginning in March 1973, contributions were mailed to the charities. Nearly 62,000 persons responded to the charities' fund appeals. Slightly over 3,000 Illinois residents sent contributions.

A total of $496,362 was paid by the charities to WIS and Helix. The charities paid an additional $94,472 to third parties to cover expenses generated by the fund raisers in their conduct of the campaigns. Additionally, Helix and WIS valued lists exchanged with third parties at

$22,031 and charged the charities $35,951 for the use of their lists in the campaigns. The trial judge in the present action concluded that the WIS-Helix conducted campaigns raised a total of $785,731, and we accept that figure.

On April 10, 1976, the trial court granted the Attorney General's motion to dismiss defendant Patrick J. Gorman Consultants, Inc. On April 19, 1976, the Attorney General filed a second amended complaint containing seven counts against the charities, against the corporate fund raisers, and against the two Gormans. In Counts I through V the complaint alleged fraud, misrepresentations, and violations of the statute regulating the solicitation of funds in Illinois for charitable purposes. The charities were accused of spending more than the statutorily allowed maximum of contributions in fund raising expenses thus leaving too little money for charitable purposes. Count II charged misrepresentation citing representation of a defunct Illinois not-for-profit corporation as an affiliate. Count III charged Helix with fraud in that it had failed to disclose high costs to the public and thus had misled donors into believing their contributions would be used for charity. In count IV the complaint alleged that WIS, through the assignment of the fund raising contract, became a knowing beneficiary of the fraudulent acts of Helix because both corporations were controlled by the Gormans. It charged that the assignment was executed to deceive law enforcement agencies. Count V charged the Gormans with the use of the corporate fund raisers as screens for their unlawful activities. In count VI, all the fund raisers were charged with fraud and unjust enrichment. Count VII charged Helix and WIS with failure to register as professional fund raisers in violation of section 7 of the Illinois solicitation act (Ill. Rev. Stat. 1973, ch. 23, par. 5107). The complaint sought an accounting from all defendants and an injunction prohibiting future solicitation.

At the close of its case-in-chief, the Attorney General moved for the reinstatement of Patrick J. Gorman Consultants, Inc., as defendants. The trial court granted this motion.

At the close of the trial, the court dismissed the action against the charities and their officers. The court found that the corporate fund raisers and the Gormans had conducted the Phase III mailings, those handled by WIS after May 1, 1973, illegitimately and without the charities' authorization. The court determined that 99.8 percent of the contributions received by the charities during Phase III were used for expenses in violation of statute. The court also found that the fund raisers had proceeded with the mailings to add new donor names to their master list in order to enrich themselves unjustly. The court found certain costs to be illegal kick-backs and self-dealings.

The fund raisers were found to have defrauded the public in the

following ways: They failed to disclose high fund raising costs to contributors; they misrepresented NPOA as a corporation chartered in Illinois and PHF as an affiliate thereof; and they deceived contributors into believing their contributions would aid charitable purposes when, in fact, the Gormans used the contracts and the corporations in a manipulative manner in order to retain 78 percent of all contributions received.

The fund raisers were enjoined permanently from soliciting funds for charitable purposes in Illinois. They were adjudged constructive trustees and ordered to pay $378,231.52 to two court-appointed trustees for distribution to widows and children of slain enforcement officers. That figure was reached by totalling the cost of the Phase III mailing and the charges for the illegal kick-backs and self-dealing. The court assessed $150,000 in punitive damages against the fund raisers.

The court entered a modification order in which it set out its interpretation of section 9(c) of the Illinois solicitation act (Ill. Rev. Stat. 1973, ch. 23, par. 5109(c)). The court construed that section of the Illinois solicitation act as requiring the application of 75 percent of total contributions toward charitable purposes. Applying that formula to the total contributions of $785,731 received by the charities, the court increased the damage award to $417,928 plus punitive damages as specified in the original judgment.

The fund raisers initially contend that section 9(c) of the Illinois solicitation act (hereinafter "The Act") is unconstitutional. That section is as follows:

> "Whenever the Attorney General shall have reason to believe that any charitable organization, professional fund raiser, or professional solicitor is * * * employed or is about to be employed in any solicitation or collection of contributions for a charitable organization any device, scheme, or artifice to defraud or for obtaining money or property by means of any false pretense, representation or promise * * * or where less than 75% of the gross receipts, excluding any bequests or gifts by will or other testamentary device, of such charitable organization as defined in Section 1 are used for charitable purposes. Gross receipts shall mean receipts after the legitimate and reasonable cost of any merchandise for resale or the legitimate and reasonable cost of services required with the fund raising event or program are deducted; in addition to any other action authorized by law, he may bring in the circuit court an action in the name, and on behalf of the people of the State of Illinois against such charitable organization and any other person who has participated or is about to participate in such solicitation or collection by employing such

device, scheme, artifice, false representation or promise, to enjoin such charitable organization or other person from continuing such solicitation or collection or engaging therein or doing any acts in furtherance thereof, or to cancel any registration statement previously filed with the Attorney General." (Ill. Rev. Stat. 1973, ch. 23, par. 5109(c).)

The fund raisers maintain that the statute impinges on due process and first amendment guarantees because the terms "legitimate and reasonable" are vague and overbroad and thus inadequately describe the conduct prohibited. The fund raisers assert that these terms have in the past and will continue to foster selective prosecution on the basis of inarticulate standards.

■■■  In dealing with first amendment freedoms, courts are constrained to examine the allegedly unconstitutional statute closely to determine if its language sufficiently describes the prohibited conduct with specificity or if the purview of the statute is so broad that it includes within its coverage both protected and unprotected speech and conduct. (*NAACP v. Button* (1963), 371 U.S. 415, 9 L. Ed. 2d 405, 83 S. Ct. 328.) We believe, however, that even applying the strict construction advocated by the fund raisers the section of the Act in question provides proper notice of its proscriptions and does not include constitutionally protected activities within its language. The basic constitutional requirement of a prohibitory statute is that it describes the acts forbidden or required in terms which can be understood by men of common intelligence. (*Connally v. General Construction Co.* (1926), 269 U.S. 385, 70 L. Ed. 322, 46 S. Ct. 126.) We believe that the words "legitimate and reasonable" are such words. The terms clarify the meaning of gross receipts and afford sufficient notice to those designated by the statute as specifically within its purview. These terms clearly alert all who are covered by the Act that the only fund-raising expenses which may be deducted from total contributions when tabulating gross receipts are those which are shown to have been justly incurred and related to furthering the solicitation efforts of the charitable organizations. If the Attorney General is able to prove that some of the costs deducted bore no relationship to the fund-raising efforts or were fabricated or illegal expenses, then such charges may not be deducted when computing gross receipts. There may be many factors to be considered in determining what constitutes legitimate and reasonable costs in a particular fund raising campaign. The same can be said, however, about most issues submitted to a trier of fact when seeking enforcement of a statute; yet that does not render the statute unconstitutional. See *United States v. Petrillo* (1947), 332 U.S. 1, 91 L. Ed. 1877, 67 S. Ct. 1538.

The fund raisers' claim of unconstitutionality does not demonstrate an

abridgement of first amendment freedoms. The challenged limitation that expenses be legitimate and reasonable to permit a deduction from total contributions does not infringe upon the charities' exercise of their right to seek public support for their organizations. Moreover, the legitimate and reasonable restriction only applies to expenses which are deducted from total contributions when computing gross receipts. Under the statute the charities and their fund raisers are allowed an additional 25 percent deduction from gross receipts and, therefore, are required to apply only 75 percent of gross receipts towards charitable purposes. That statutory formula was devised to secure protection for the donations given charities by the public and we do not perceive that it unconstitutionally limits the charities in the exercise of their first amendment rights.

Citing three trial court decisions (*People v. Moore Equipment Co.* (1975), No. 75 CH 5144 (Cook County); *People v. Johnson* (1975), No. 74 CH 7 (Lake County); and *People v. Jacobi* (1974), No. 73 CH 7101 (Cook County)), the fund raisers maintain that the language employed in section 9(c) has led to a series of prosecutions demonstrating the inconsistent manner in which the statute has been construed and applied. Upon an examination of the proceedings and results of those cases, we find that they demonstrate uniformity of approach and a furtherance of the purposes underlying the Act. We find no contradictory pattern of statutory construction.

■■ The fund raisers next contend that the trial court erred in construing section 9(c) as requiring the application of 75 percent of total receipts for charitable purposes. We also have granted leave to the Fraternal Order of Police to file an amicus curiae brief challenging the trial court's holding in this regard.

We do not agree with this interpretation of the Act by the trial court. Section 9(c) obviously permits deduction of reasonable and legitimate expenses of a fund raising program prior to computation of the 75 percent of gross receipts which must be utilized for charitable purposes. Section 9(c) provides that a violation of the Act has occurred "where less than 75% of the gross receipts * * * are used for charitable purposes. Gross receipts shall mean receipts after * * * the legitimate and reasonable cost of services required with the fund raising event or program are deducted * * *." Ill. Rev. Stat. 1973, ch. 23, par. 5109(c).

In its modification order the trial court set forth that the damage award was computed by utilizing a formula requiring application of 75 percent of total contributions toward charitable purposes without deducting any expenses. This was error since the statute allows the deduction of costs shown to have been legitimately and reasonably incurred. This portion of the judgment must be remanded for a hearing in accordance with the statute.

The fund raisers also contend that the trial court lacked jurisdiction over their persons. The corporate fund raisers and the Gormans had filed special and limited appearances objecting to jurisdiction along with motions to quash summons. After hearing argument, the trial court denied the motions, ordered the special appearances to stand as general appearances and ordered the parties to answer the complaint.

■■ Section 5 of the Act (Ill. Rev. Stat. 1973, ch. 23, par. 5105) prescribes the methods of service of process on organizations or persons covered by the Act but without an office in Illinois. Section 5 provides in pertinent part:

> "Any charitable organization, person, professional fund raiser or professional solicitor, which or who solicits contributions in this State, but does not maintain an office within the State shall be subject to service of process, as follows:
>
> * * *
>
> (b) When a charitable organization has solicited contributions in this State, but maintains no office within the State, has no registered agent within the State, and has no designated person having custody of its books and records within the State * * * service may be made by delivering to and leaving with the Secretary of State, or with any deputy or clerk in the corporation department of his office, three copies thereof and a fee of $6:
>
> (c) Following service upon the Secretary of State the provisions of law relating to service of process on foreign corporations contained in 'The Business Corporation Act,' filed July 13, 1933, as heretofore and hereafter amended, shall therefore govern:
>
> (d) The solicitation of any contribution within this State shall be deemed to be the agreement of the charitable organization that any process against it which is so served in accordance with the provisions of this Section shall be of the same legal force and effect as if served personally within this State."

The fund raisers maintain that failure of subparagraphs (b) and (d) specifically to include the term professional fund raisers automatically excludes such fund raisers from the section's application. The argument is without merit. Section 5 clearly states that professional fund raisers shall be subject to service of process as provided in the Act. The trial court correctly found that it had jurisdiction over the fund raisers.

The Gormans also contend that the trial court did not obtain jurisdiction over them because the letters from the Secretary of State were addressed incorrectly. This point was expressly waived in a trial memorandum filed in support of objections to the court's assertion of jurisdiction over their persons. Defects in jurisdiction over the person may be waived. (*Mullaney, Wells & Co. v. Savage* (1975), 31 Ill. App. 3d 343,

334 N.E.2d 795.) If the parties have waived such objections, they may not raise the issue for the first time in a court of review. *Ray v. City of Chicago* (1960), 19 Ill. 2d 593, 169 N.E.2d 73.

With regards to the charge of common law fraud, the fund raisers by their conduct brought themselves within the jurisdiction of the Illinois courts. (Ill. Rev. Stat. 1973, ch. 110, par. 17(1)(a).) To subject a person to *in personam* jurisdiction, if he is not present within the forum, it is sufficient that he has minimum contacts with the forum so that the bringing of the suit in that forum does not offend fair play and substantial justice. (*International Shoe Co. v. Washington* (1945), 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154.) There must be some act by which the defendant avails himself of the privilege of conducting activities within the forum State, thereby invoking the benefits and protections of its laws. *Hanson v. Denckla* (1958), 357 U.S. 235, 2 L. Ed. 2d 1283, 78 S. Ct. 1228.

■■ In the present case the fund raisers conducted nationwide mail campaigns. A good portion of their efforts was directed towards obtaining monetary contributions from Illinois residents. Much of their literature described NPOA as an Illinois organization and PHF as an affiliate thereof. Moreover, representatives of the charities and the fund raisers met in Illinois during September 1973 to settle claims which the fund raisers had asserted. The parties did reach an agreement purporting to settle the disputes between the parties. As to the charges of common law fraud, the negotiation and execution of the settlement agreement in Illinois provide the necessary nexus between this State and the fund raisers to allow the Illinois court to assert jurisdiction over the fund raisers.

■■■ The fund raisers argue that the exercise of jurisdiction over them amounts to an unconstitutional extraterritorial application of Illinois law. They base this contention on the fact that of the approximately 60,000 persons who made contributions, only 3,000 were Illinois residents. Accordingly, they maintain that Illinois courts can be concerned only with monies contributed by Illinois residents and may not render judgment involving solicitation of funds from nonresidents. We believe the fund raiser's analysis erroneous; we hold that their activities in Illinois provided the basis for the common law fraud action involving their relationship with the charities. The settlement agreement of September 1973 which was negotiated in Illinois was not an isolated transaction between the charities and the fund raisers. Rather, it was an inextricable part of the fund raisers' long pattern of activities relative to the fund appeals. The settlement agreement made specific reference to the parties' prior agreements and purported to settle all differences between them. The entire fund raising program came into issue upon the execution of the settlement agreement. (See *United States Ry. Equipment Co. v. Port*

*Huron & Detroit R.R. Co.* (7th Cir. 1974), 495 F.2d 1127.) Since the 1973 meeting took place in Illinois, the fund raisers purposefully availed themselves of the privilege of transacting business in Illinois and, therefore, subjected themselves to Illinois jurisdiction in all matters concerning their conduct. See *People v. National Cancer Hospital of America* (1956), 1 N.Y.2d 802, 135 N.E.2d 596.

The fund raisers next contend that all expenses incurred by them in the fund raising campaigns were reasonable and legitimate. At the outset, they assert that the arbitration hearing in Georgia resolved the issue of the legitimacy of the costs charged the charities. The fund raisers further maintain that the subsequent dismissal of the suit brought by the charities in Kentucky rendered *res judicata* any claims that the fund raisers had incurred improper charges during 1972 and 1973. We do not agree.

■■ In their demand for arbitration the fund raisers claimed that the charities owed them $135,000. The fund raisers were awarded $24,600 which was reduced to judgment in Georgia and satisfied by payment of $20,000. The arbitration award does not recite the issues considered nor does it give any specific findings. We will not presume that the arbitration panel passed on the reasonableness or the legitimacy of all expenses incurred by the fund raisers. The fund raisers assert that in their opening statements at the arbitration both counsel referred to the proprieties of the charges to the charities, but that the court in the present proceedings refused to admit the unsworn statements into evidence. The determination as to the admissibility of evidence rests primarily in the discretion of the trial court, and its decision will be reversed only where that discretion clearly has been abused. (*Cratsley v. Commonwealth Edison Co.* (1976), 38 Ill. App. 3d 55, 347 N.E.2d 496.) The fund raisers attempted to introduce the arguments of counsel at the arbitration hearing not the sworn testimony of witnesses. It was proper for the court to exclude the proffered evidence.

The fund raisers' assertion that the dismissal of the suit in Kentucky bars the present proceedings also is without merit. The Kentucky complaint filed by the charities requested an accounting and damages based upon the fund raisers' failure to conduct two mailings in 1973, the unauthorized use of NPOA's name, the fund raisers' unlawful exercise of dominion over the list of donors belonging to the charities, and the fund raisers' unfair trade practices which resulted in damage to the charities' reputation. In our view the issues raised in Kentucky are distinct from those raised by the Attorney General in the present case.

When invoking the doctrine of *res judicata*, defendant must prove its applicability by clear and convincing evidence. (*Kuehner v. Melliere* (1969), 118 Ill. App. 2d 348, 255 N.E.2d 36.) It must be shown that in the prior adjudication some controlling fact or question was presented which

is material to the determination of both cases. It also must be demonstrated that the same fact or question was litigated between the same parties and that its adjudication in the first suit conclusively would determine the same question in the subsequent suit. *Smith v. Bishop* (1962), 26 Ill. 2d 434, 187 N.E.2d 217.

■■ The parties at interest in the prior law suit and arbitration and the issues involved were different from those before the trial court in this controversy. In Kentucky the charities sought damages for themselves for wrongful acts committed by the fund raisers. Here, the Attorney General's complaint is premised on recovering monies on behalf of the contributing public and to enjoin future solicitation in Illinois. Although recovery was only against the fund raisers, the action also was brought against the charities. This action is not barred by *res judicata.*

The fund raisers also challenge the trial court's finding that the Phase III mailings, which were carried out from May 8 through June 1973, were unauthorized and conducted for the self-gain of the fund raisers. Schira sent a letter to the fund raisers on April 26, 1973, stating that he was postponing a decision regarding future mailings. On May 1, 1973, Martin Gorman wired Schira that three million letters costing $210,000 already had been printed. Schira believed that the charities would be required to pay for those letters if they were not mailed. Schira sent Nichols to negotiate a contract on behalf of PHF, but did not authorize Nichols to approve the mailing contents. On May 8, 1973, the parties entered into a contract which included a schedule for mailing for Phase III. This contract provided, as did the previous ones, that the charities give prior approval to material before any mailings commenced. The Phase III mailings yielded approximately $300,000, but cost the charities almost $299,000. The actual profit was $634.

The fund raisers submit that the mailings were justified since 40,000 new names were added to the "house list." The contracts with the charities provided that Helix and WIS had the sole right to rent and exchange those names for their own benefit. According to Martin Gorman, Helix rents its lists for $40 per 1000 names twice a month for an average life span of 18 months. Gorman testified that the only test employed by the fund raisers in deciding to use a certain list was whether the yield in donations for that list allowed a previous campaign to "break even." During Phase III, the three million letters were sent to names on lists owned or managed by Helix and to names on lists rented from outside list brokers. The fund raisers selected the lists without consulting the charities.

The evidence sustained the trial court's finding that the fund raisers conducted the Phase III mailings in their own self-interest and without considering the charitable purposes supposedly to be furthered. The fund

raisers are liable for expenses wrongly incurred and an injunction properly issued. The fund raisers did not consult with the charities as to the number of potential donors to be contacted, but rather ordered $210,000 in materials in violation of their contract requiring prior approval by the charities of all letters to be sent. The fund raisers ordered the quantity they deemed necessary and then rented and exchanged lists of donor names without consulting the charities. Martin Gorman testified to the use of the corporate lists and admitted that the campaigns resulted in an increased number of names for those lists.

■■ In Illinois, there is no general rule stating what facts constitute fraud, and whether or not it is found depends upon the facts of each case. (*Majewski v. Gallina* (1959), 17 Ill. 2d 92, 160 N.E.2d 783.) In *Zokoych v. Spalding* (1976), 36 Ill. App. 3d 654, 664, 344 N.E.2d 805, this court stated:

> " 'It may be based on concealment; on fraudulent devices; on a wilful, malevolent act directed to perpetrate a wrong to the rights of others; unlawful appropriation of another's property by design, or conduct that operates fraudulently on the rights of others, and is so intended. In short, it comprises all acts, of omissions and concealments, including breach of legal or equitable duty, trust or confidence, resulting in injury to another.' [Citations.]"

Here the fund raisers' fraudulent conduct consisted of ordering $210,000 in literature without the charities' required approval and their subsequent conducting a campaign knowing of the exceedingly high costs. They made use of lists which would benefit their operations; the lists had not been tested to yield profit but merely to break even. Although the public might be aware that the entire amount contributed to a charity cannot be used for charitable purposes, it is entitled to be apprised of promotions which entail high operation expenses. The fund raisers' concealment of such costs and their use of sham corporate entities to fill their own coffers render them accountable for expenses illegitimately incurred.

The fund raisers maintain that the following statements included in the "Tips" letter and the accompanying contribution card were sufficient to apprise the public that a portion of the charitable dollar necessarily was expended for operating costs:

> "So a large part of the funds we receive from good, law-abiding citizens like you help us continue this urgent campaign to inform and gain the vitally needed support of more and more Americans."
> "Here's my gift * * * to help reach and gain the support of more concerned citizens * * * so you can continue and expand your vital police aid and public information programs."

These statements would lead a donor to believe that the "large part" of his contribution will go into a fund to expand the charities' information program. In reality the large part of the donor's dollar was being used to

pay for the campaign and very little was left over to expand the programs. The fund raisers did not disclose the operating costs to the public. The trial court saw the witnesses and heard the evidence. We are not justified in overturning the trial court's findings unless they are manifestly wrong or against the weight of the evidence. *Ross v. 311 North Central Avenue Building Corp.* (1970), 130 Ill. App. 2d 336, 264 N.E.2d 406.

■■ Regarding the propriety of charges to the charities in other campaigns conducted by the fund raisers, the trial court determined that Helix's rental of its own lists to the charities constituted self-dealing and, therefore, was an unreasonable and illegitimate expense. According to Martin Gorman, Helix had purchased the house list of National Emblem products for its own. Patrick Gorman testified that throughout all of the fund drives Helix rented its house list to the charities. He further testified that its lists contained the names of donors who had just contributed to the charities in the current campaign. The fund raisers thus rented the charities' own names back to them and obtained rental fees. They also rented these same names to other charities for fees. These charges were illegal and the fund raisers' concealment of those facts constituted fraudulent conduct for which they can be held accountable. *Fairfield Savings & Loan Association v. Kroll* (1969), 106 Ill. App. 2d 296, 246 N.E.2d 327.

The trial court also found that the fund raisers' charge for commissions involving list rentals in which they acted as brokers represented unlawful "kickbacks". There is no evidence that the fund raisers sought out the most costly lists in order to obtain a larger commission or that the commissions resulted in additional expenses for the charities. The contract of November 1, 1972, provided that the fund raisers were entitled to commissions from list owners for list rentals but: "It being understood that such commissions are not additional costs for the client, but costs for the supplier who contract with Helix." We have found no evidence that the charities paid more than the market value for the rented lists. The fact that the fund raisers retained 20 percent in commissions did not result in additional costs and this charge cannot be deemed illegal or unreasonable.

The trial court also found that the fund raisers' exchange of lists with other list brokers constituted "fictitious charges." The court held that since the contracts did not authorize such a procedure and since the fund raisers charged the charities the full rental amount, such charges were fabricated in order to bill the charities additional amounts. The evidence reveals that the lists were exchanged and were not given to the fund raisers free of charge. Nothing in the record indicates that the fund raisers charged the charities more than the fair rental value of the lists. Since the fund raisers

were obligated to exchange some of their own property for that which they received, the charges for the exchanges cannot be deemed fictitious.

■■ The fund raisers next contend that the award of punitive damages was improper because such damages were not requested by the Attorney General but were imposed by the trial court without any notice. Section 34 of the Civil Practice Act provides in pertinent part:

> "Every complaint and counterclaim shall contain specific prayers for the relief to which the pleader deems himself entitled * * *. Except in case of default, the prayer for relief does not limit the relief obtainable, but where other relief is sought the court shall, by proper orders, and upon terms that may be just, protect the adverse party against prejudice by reason of surprise." (Ill. Rev. Stat. 1973, ch. 110, par. 34.)

Thus, a defendant is entitled to be apprised of the precise charge brought against him, the nature and extent of the relief sought, the property which may be affected, and an opportunity to defend the charge. (*Klehm v. Klehm* (1963), 41 Ill. App. 2d 423, 191 N.E.2d 69.) It is the obligation of a court of review to determine whether in fact, applying the law and legal and equitable principles, reversal of the trial court is mandated by an omission to request punitive damages specifically and the assessment of such damages *sua sponte* by the trial court. (*Kubajak v. VerBrugge* (1965), 59 Ill. App. 2d 344, 207 N.E.2d 344.) There, this court held that the giving of a punitive damages instruction where plaintiff did not pray for such damages did not warrant reversal because the amount of the verdict clearly indicated that no punitive damages were in fact awarded. However, such a practice was not condoned. We stated at page 352: "If the verdict in its amount had been substantial so that, on a reasonable review of the record it was felt that the jury did in fact make an award of punitive damages, we would be moved to remand for a new trial."

■■ In the present case, the fund raisers were assessed $150,000 in punitive damages. Although the complaint charged them with egregious conduct, the only relief sought was an injunction and an accounting of monies received. The amount of punitive damages awarded was substantial; the fund raisers were unfairly surprised by their assessment; and the court erred in making the assessment.

We next consider the contention that Patrick J. Gorman Consultants, Inc., was improperly reinstated as a party defendant at the close of plaintiff's case-in-chief. It asserts that the trial court incorrectly ordered its reinstatement because at the time of filing the second amended complaint the Attorney General had moved to voluntarily dismiss the Consultants. The trial court had granted that motion.

● 14  Where a defendant has been voluntarily nonsuited upon motion of a plaintiff, the court is without power to set aside the order of dismissal and reinstate the cause unless at the time the plaintiff moves for a voluntary nonsuit, leave is given plaintiff to move to set it aside. (*Weisguth v. Supreme Tribe of Ben Hur* (1916), 272 Ill. 541, 112 N.E. 350; *Bettenhausen v. Guenther* (1944), 388 Ill. 487, 58 N.E.2d 550.) The reason for the rule is that if a plaintiff voluntarily secures the dismissal of his suit, it must be deemed that he anticipated the effect and results of his action and, therefore, should not be restored to the position and rights which he abandoned of his own will. Having moved for dismissal, his only recourse is to begin his action anew. *Fulton v. Yondorf* (1944), 324 Ill. App. 452, 58 N.E.2d 640.

■■  In the present case, the Attorney General moved to dismiss the Consultants on April 16, 1976. At that time it was not requested that leave to reinstate be granted. In view of Illinois case law, we must hold that the trial court incorrectly ordered reinstatement of the Consultants as a party defendant at the close of plaintiff's case-in-chief.

■■  Finally, we shall consider the charities' contention that the trial court erred in dismissing their third-party complaint which sought expenses incurred while defending the present action. Under Illinois law in the absence of a statute or agreement between the parties, a successful party is not entitled to recover attorneys' fees or costs of litigation, except where a fund has been brought within the control of the court by the parties. (*Hamer v. Kirk* (1976), 64 Ill. 2d 434, 356 N.E.2d 524.) Exceptions to this general rule are to be narrowly construed. (*Insurance Co. of North America v. J. L. Hubbard Co.* (1974), 23 Ill. App. 3d 254, 318 N.E.2d 289.) In the present case, no statute authorizes the allowance of attorney's fees. The charities submit that the damage award served to bring a fund within the control of the court, thus authorizing a grant of attorneys' fees. It is unclear from their argument whether the charities request attorneys' fees to be paid out of the damage award or whether the assessment of damages is sufficient to allow recovery of attorneys' fees. In either case, the trial court properly denied the request.

The action against the fund raisers was brought by the Attorney General and any sums recovered are for the benefit of the contributing public. Participation of the charities in this case was as a defendant and the trial court's dismissal of charges against them did not place them in a position whereby they are entitled to recover attorneys' fees from the damage award. Nor does the assessment of damages against the fund raisers permit an additional award of attorneys' fees in favor of the charities. The charities argue that they participated in this action as an ancillary government force and that it would be in the public interest to

award attorneys' fees. In *Hamer v. Kirk* the court expressly rejected such an argument, citing *Alyeska Pipeline Service Co. v. Wilderness Society* (1975), 421 U.S. 240, 247, 44 L. Ed. 2d 141, 147, 95 S. Ct. 1612, 1616:

> " '[I]t would be inappropriate for the Judiciary, without legislative guidance, to reallocate the burdens of litigation in the manner and to the extent urged by respondents * * *.' " 64 Ill. 2d 434, 442.

The charities, through their activities and solicitation of donations in Illinois, were amenable to an action for unlawful conduct as brought by the Attorney General. However, there is no basis under Illinois law which allows them to recover the expenses involved in defending this action, even though the evidence proved their fund raisers were the culpable parties.

In sum, the trial court's order enjoining WIS, Helix and the Gormans individually from soliciting funds in Illinois in the future is affirmed. That part of the order requiring the aforementioned defendants to pay the State compensatory damages also is affirmed; however the cause is remanded for further proceedings consistent with the holdings of this opinion to determine the amount of compensatory damages to be awarded. The order dismissing the charities' third-party complaint against the fund raisers is also affirmed. That portion of the order awarding punitive damages against the fund raisers is reversed, and the order entering judgment against Patrick J. Gorman Consultants, Inc., is reversed.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed in part, reversed in part, and in part reversed and remanded for further proceedings consistent with the holdings of this opinion.

Affirmed in part; reversed in part; and reversed and remanded in part.

JIGANTI, P. J., and McGILLICUDDY, J., concur.