Larkin, J.
This is an appeal from the trial judge’s grant of a Motion to Dismiss for Failure to State a Claim upon which Relief could be Granted, pursuant to Mass. R. Civ. P. Rule 12 (b), in the context of a complaint which raised issues involving the putative obligations and responsibilities of a real estate brokers vis a vis a prospective purchaser.
The following facts appear of record:
Plaintiff, Edward N. Lacoille, is a resident of Hatfield, Massachusetts. Defendants, David Dulong and Paul Labbee are licensed Massachusetts real estate brokers, d/b/a “Realty World/Dulong and Labbee,” a real estate ■agency located in Northampton, Massachusetts.
"On or about July 1, 1982, the defendants executed an Exclusive Listing Agreement to sell certain real property owned by Bayuk Cigars, Inc., (hereinafter the “seller”) and located in Hatfield, Massachusetts.
On July-23, 1982, plaintiff (hereinafter “Lacoille”) executed an offer to purchase the subject property through the Dulong and Labbee Agency (hereinafter the “brokers”). Lacoille offered to purchase the real estate for the sum of $25,000.00. However, this offer of $25,000.00 was expressly subject to the seller performing and paying for certain “percolation” tests on the property. This offer, which was accompanied by a deposit of $500.00, was expressly rejected by the seller on July 6, 1982 and Lacoille’s deposit was returned to him.’
On or about July 15, 1982, the brokers contacted and engaged Harold L. Eaton of Hadley, Massachusetts, a Registered Land Surveyor, to survey the property at issue with a view towards exploring the possibility of subdividing the locus into several smaller parcels. This survey was undertaken during the months of August and September 1982.
While the survey was being accomplished, and on or about August 15,1982, Lacoille was again contacted by the brokers (specifically by Dulong) and again asked if he wished to submit another offer for the property. Lacoille indicated that he simply wished to “resubmit” his.prior offer but added the *271 additional condition that the seller would be responsible for pa\ inf? the cost of any survey that was being conducted. Lacoille's directive to the brokers to “resubmit” his prior offer was never formalized in writ ing nor did he give t lie brokers another deposit.
On or about September 5, 1982, Lacoille noticed "survey type flags" on the real estate in question. He then contacted the brokers "to ascertain t he st at us of his offer” and was then informed that the brokers were purchasing the property for themselves. It was subsequently learned that the brokers purchased the subject property for $25,()()().()().
In January 1983, Lacoille filed a complaint in two counts against the brokers. Count I alleged the tort of interference with contractual relations and Count II asserted rights under M.G.L. c. 93A. I’nder Count I. Lacoille alleged that the actions of the brokers constituted “a blatant interference with the contractual relationship” causing him “serious monetary damages." Under Count II, Lacoille contended that the actions of the brokers const it ut ed “an unfair method of competition actionable under M.G.L. c. 93A, § 11.”
The brokers filed a Motion to Dismiss for Failure to State a Claim upon which Relief could be Granted under Mass. It. Civ. P. Rule 12 (b) with an affidavit and memorandum in support thereof. Lacoille also filed an affidavit and memorandum in opposition to the motion. A hearing was held and the motion allowed. Thereafter, Lacoille filed a Motion to Alter or Amend Judgment which motion was denied by the trial judge. The present appeal followed.
Before turning to the principal substantive questions before us — issues involving the evolving and emerging duties and obligations of real estate brokers to prospective purchasers — there is a th reshold procedural issue. At the hearing on the motion to dismiss, neither party filed requests for findings or rulings and no specific findings or rulings were entered by the trial judge.
In the generality of situations, requests for rulings lie at the heart of the process in appellate division practice. Mass. R.C.P., Rule 65, requires that an aggrieved party file specific Requests for Rulings of Law in order to give the trial judge an opportunity to formulate with precision the relevant and appropriate rule of law and the further opportunity to correct any latent inconsistencies between findings of fact and rulings of law. See, e.g., Adkins v. Armata, 56 Mass. App. Dec. 50 (1975). Without requests for rulings, questions of law which might have been raised thereby are not open on appeal as a matter of right. Arrow Paper Corp. v. Boylston Foods, Inc., 1 Mass. App. Ct. 808 (1973); Drain v. Brookline Sav. Bank, 327 Mass. 235 (1951). The necessity to file requests does not obtain with the same scrupulosity where a trial judge has granted a motion to dismiss for failure to state a cause of action. In this context, where, in effect, the trial process is aborted at the outset of the proceeding, all of the relevant pleadings and affidavits, etc., are before the Appellate Division and our sole inquiry is to ascertain whether, looking at the entire record before us, there exists any state of facts which could be proved in support of the asserted claims. For example, in the present case, is there any conceivable view of the record, according all favorable inferences to the pleadings, which would support Lacoille’s complaint? If this question is answered in the affirmative, then the trialjudge erred in granting the motion to dismiss. See, e.g., 2A MOORE FEDERAL PRACTICE § 2245.
We turn then to an analysis of Count I of Lacoille’s complaint — the Count asserting interference with contractual relations.
The specific tort of intentional interference with prospective contractual relations has been recognized as an extension of the more generalized tort of *272 interference with contractual relations. Chemawa Country Club, Inc. v. Wnuk, 9 Mass. App. Ct. 506 (1980). RESTATEMENT (SECOND) OF TORTS § 766B (1979), sets out the elements necessary to recovery under this tort as follows:
One who intentionally and improperly interferes with another’s prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.
Under Massachusetts law, it is now well established that in the absence of legaljustification, intentional interference with a contractual right by a party not privy to the contract is actionable by the party injured. See, e.g., Steranko v. Inforex, Inc., 5 Mass. App. Ct. 253 (1977). There it was held that a corporate officer's actions assertedly interfering with a third party’s contractual relationship'with the corporation was not actionable because the conduct at issue took place in the context of legitimate corporate duties. However, absent a legal justification for a course of conduct, liability for tainted activities is not delimited to present commercial actualities but may extend to relations reasonably likely to continue to ripen into future contracts or commercial potencies. Cf. Laurendeau v. Kewaunee Scientific Equipment, 17 Mass. App. Ct. 113; 456 N.E.2d 767 (1983). In this area of the law, improper interference is the key. The genesis of this requirement has its roots in the celebrated case of Lumley v. Gye, 2 EL & BL 216, 118, Eng. Rep. 749 (1883), where it was noted that obtaining business for oneself is privileged as long as the means used to procure that business are not unlawful in themselves. In Massachusetts, for example, “unlawful means” include cases in which the allegedly proscribed conduct is “per se” unlawful — viz, a violation of the CODE OF MASSACHUSETTS REGULATIONS, or where the defendant is found to be motivated by malice or wantonness. See, e.g.', Walker v. Cronin, 107 Mass. 555 (1871).In effect, a plaintiff to prevail must show an element of malice, demonstrated through a palpable and purposeful course of conduct, or through a blatant disregard of predictable consequences. Absent lawful justification, an activity may be deemed “malicious in law although it arose from good motives. . . .’’ Grammenos v. Zolatas, 356 Mass. 594 (1970); see also, Trinque v. Mt. Wachusett Community College, 14 Mass. App. Ct. 191 (1982).
As-seen above, a defendant may escape liability for intentional interference with prospective contractual relations (in effect, the cause of action asserted here), when the behavior is justified. See, Caverno v. Fellows, 300 Mass. 331 (1938).[3] However, where actual malevolence is asserted, evidence of this element may be introduced to defeat a defendant’s claim of justificatipn or privilege. Moran v. Dunphy, 177 Mass. 485 (1901). Finally, where justification is pleaded, it is the defendant’s burden to establish such exculpation.
*273 With these principles as preface we examine the specific elements of the specific claims asserted by the plaintiff in his complaint. Lacoille argues that the following elements are present in the present case:
(1) A legally protected interest.
(2) Intentional conduct on behalf of the Brokers adverse to that interest.
(3) Conduct which was actuated by malice or wantonness or is unlawful “per se.”
(4) Demonstrable damage flowing to him.
(In enumerating these elements he draws heavily on Old Colony Donuts, Inc., v. American Broadcasting Co., 368 F. Supp. 1974).[4]
In dealing with the above enumerated elements, it is clear that the question of whether “under any conceivable view of the record” Lacoille had “a legally protected interest” is the threshold issue here. The answer to that question turning on an analysis of the dealings of the parties, and the presence of the broker relationship, with its emerging and somewhat amorphous calculus of correlative rights, responsibilities and expectancies — is what this case is all about.
Lacoille argues that his “legally protected interest” is “his right to contract.” In effect, he argues that it was his “intention” to create a legal relationship with the Seller which, but for the supervening and assertedly illicit conduct of the brokers in usurping this expectancy, would have come to fruition with predictable economic benefits. Pretermiting this seductive and, at least according to one commentator, “misleading” term,[5] it is clear that interference with a viable expectancy of a contractual right may be subsumed within the general rubric of a “legally protected interest” where that interest - however conceptually latent or inchoate - is reasonably close to providing an actual benefit. Here, however, to say the least, Lacoille’s contractual “rights” appear to have remained at a relatively nascent stage - at least after the Seller’s rejection of his initial offer of $25,000.00 (to which Lacoille had engrafted the imposition of the additional term or requirement that the seller undertake, and pay for, a percolation test) and the return of the original (and only) deposit of $500.00. Can it be said that what Lacoille then undertook by way of subsequent generative conduct was “reasonably likely to continue and ripen *274 into future contracts?" Laurendeau v. Kewaunee Scientific Equipment, supra. In essence, that conduct consisted in the apparently casual suggestion, when queried by the brokers whether he wished to submit a new and additional offer, that the brokers simply “resubmit” the original offer. Indeed, it was not only a directive to “resubmit” an offer which had been flatly rejected only two weeks earlier but which, in its now “recast form,” contained an additional and presumably more onerous term — the requirement that the seller pay the costs of any survey to be undertaken. Absent reinforcing radiations deriving from the “special circumstances” of the presence of the real estate broker relationship vis a vis Lacoille, it is difficult to perceive that the plaintiffs putative legally protected interest - the right to contract - had become “reasonably likely to continué.”
In considering the subject of the duties which real estate brokers owe to prospective purchasers, a word of background on this evolving area maybe in order. Traditionally the touchstone of the relationship between the real estate broker and a prospective purchaser was the phrase caveat emptor. Since World War II, however, this traditional view of broker responsibility has been subject to widespread judicial review and revision. Sensitive to the increasing complexity of real estate transactions, the public protection policy underlying broker licensure, and the social values involved in consumer protection generally, courts have sought to fashion measures of liability which more nearly reflect the needs and realities of the real estate marketplace. See, generally, Comment, A Reexamination of the Real Estate Broker-Buyer-Seller Relationship, 28 WAYNE L. REV. 1343, 1345 (1972).
In the last two or three decades, courts have been changing their traditional hands-off position regarding the viability of the purchaser’s - or putative purchaser’s - claim against the real estate broker. Since the broker in a real estate transaction was usually deemed the seller’s agent, the buyer-broker relationship, again, has historically been one of caveat emptor. Consequently, it was the usual rule that the real estate broker had no fiduciary or affirmative obligations to prospective purchasers. Ries v. Rome, 337 Mass. 276, 149 N.E.2d 366 (1958); Fish v. Teninga, 30 Ill. 160, 161 N.E. 515 (1928). Courts have held brokers liable to buyers only when the buyer could prove fraud byway of affirmative (and usually gross) misrepresentation on the part of the broker. Isenbeck v. Burroughs, 217 Mass. 537 105 N.E. 595 (1914); Hokanson v. Oatman, 165 Mich. 512, 131 N.W. 111 (1911); Lear v. Banden, 75 Colo. 385, 225 P. 831 (1924).
Contrary, to this traditional position, in recent years, courts have held that the broker does indeed have certain duties to a potential buyer. Although this area of the law remains in a state of flux, an analysis of case law reveals that, basically, there are three different sources of this duty. Some courts, keying on the traditional source, tort law, have fashioned remedies that predicate liability on theories that apparently go beyond the scope of active fraud. See, e.g Mertens v. Wolfeboro National Bank, 119 N.H. 453; 402 A.2d 1335 (1979). Another source of a judicially imposed duty has been agency law, with some courts holding that the real estate broker may indeed be the agent of the buyer even though the agent has never, in the traditional consensual sense, agreed to such an arrangement. See, Brown v. Coates, 102 U.S. App.D.C. 300, 253 F.2d 36 (1958) and Spindler v. Kreiger, 16 Ill. App. 2d 131, 147 N.E.2d 457 (1958). See also Caveat Emptor, The Doctrine’s Stronghold, 1 WILLAMETTE L. J. 369 (1960); Young & Harper Quaere: Caveat Emptor or Caveat Venditor? 24 ARK. L.REV. 245 (1970); Commercial Law - Implied Warranties in Sales *275 of Real Estate - The Trend to Abolish Caveat Emptor, 22 DEPAUL L. REV. (1975).
A third theory finds its genesis in the increasing state regulation of the real estate brokerage industry and can be characterized as a “public policy approach.” Courts finding brokers liable under such a theory have reasoned that public policy, as expressed in state statutes or administrative systems regulating the real estate brokerage industry, require brokers to act in a more vigorously honest and ethical manner toward consumers, in variant contexts and, wherever they may be found, in the real estate marketplace. See, e.g., in Massachusetts, 254 C.M.R. et seg.[6]
A brief conspectus of representative approaches to broker liability under the emerging case law under each of these theories may be useful before returning to the facts of record before us on the instant appeal.
As noted previously, the most conspicuous example of courts alacrity to impute liability is in the area of fraud or factual situations which approximate either actual fraud or “sharp practice.”
Fraud has historically been the most viable legal option for property buyers seeking redress from a real estate broker since, traditionally, the law of agency does not shield the agent from liability in tort to a third party. See RESTATEMENT (SECOND) OF AGENCY § 343 (1957). However, to assert a successful claim of fraudulent misrepresentation, a buyer normally must prove a multitude of factors. Most states require the proving of some five or six elements for there to be actionable fraud, although some states occasionally embody the same elements in an even longer list. For example, Arizona apparently recognizes 9 elements. See, e.g., Carrell v. Lux, 101 Ariz. 430, 420 P.2d 564, 568 (1966). The five typical factors which constitute fraudulent misrepresentation are, first, a misrepresentation of a fact materially affecting the value or desirability of the property; second, the broker’s knowledge of the falsity of the representation and that such facts are unknown or beyond the *276 reach of the buyer; third, the broker’s intention to induce action by the purchaser; fourth, inducement of or reliance by the purchaser by reason of the misrepresentation; and fifth, resulting damages. See Shane v. Hoffman, 227 Pa. Super Ct., 176, 324 A.2d 532, 536 (1974); Otlener v. Zanora, 94 Ill.App.3d 651, 653, 418 N.E.2d 506, 508 (1981). In this area, it is also well established that fraud must be proven by clear and convincing evidence. Hughes v. Hold, 140 Vt. 38, 435 A.2d 687 (1981); Shane v. Hoffman, supra at 176, 324.
Although active overt misrepresentation used to be necessary for fraud to be actionable, most states have recognized that an action for fraud and deceit is maintainable for so-called “negative” fraud, also known as nondisclosure or fraudulent concealment. This tort arises when there is a failure of a party to a transaction to fully disclose facts of a material nature when there exists a duty to speak. PROSSER ON TORTS (4th Ed. 1971) 695-696, 37 AM. JUR. 2d Fraud and Deceit § § 144 and 145, p. 197-201. In order for such a duty to exist, there must be a concealment of material facts — that is, the party sought to be charged must have had knowledge of the facts which he allowed to remain undisclosed — and the silence must, under the total circumstances, amount to fraud. 37 AM. JUR. 2D Fraud and Deceit § 145, p. 199-201.
As a result, the elements for a cause of action for damages based on nondisclosure, then, are almost identical to those for misrepresentation, except that nondisclosure, rather than misrepresentation, becomes the focus of the inquiry. In the generality of cases in this area, the five typical elements, again, áre: a nondisclosure by the broker of facts materially affecting the value or desirability of, the property; the broker’s knowledge of such facts and of their being unknown to or beyond the reach of the buyer; the broker’s intention to induce action by the buyer; inducement of or reliance by the buyer to act by reason of the nondisclosure; and, finally, resulting damages. See, e.g., Lingsch v. Savage, 213 Cal. App. 729, 29 Cal. Rptr. 201, 8 ALR 3d 537, (1963) and Harper v. Adametz, 142 Conn. 218, 113 A.2d 136 (1955).
Some of the foregoing cases suggest that a broker’s lack of knowledge is defense. See Fowler v. Benton 229 Md. 571, 185 A.2d 344, (1962) (Broker did not know septic tank was inadequate for house); Huttegger v. Davis, 599 S.W.2d 506 (Mo., 1980) (broker did not know water supply would not be available for two years); Russow v. Bobola, 2 Ill. App.3d 837, 277 N.E.2d 769 (1972) (broker had no knowledge that water had entered house prior to purchase). The defense of fraud based on lack of knowledge, however, does not always succeed when the broker has made an affirmative representation of something that in fact is not true even though the broker does not have knowledge of its falsity. An illustrative case in this area is Spargnapani v. Wright, 110 A.2d 82 (D.C., Mun. App.) (1954), where a broker represented to a prospective purchaser that the heating system in the house was in good condition when, in fact, it was defective and unusable. Although the agent denied making a representation that the system was in good condition, she did admit that she told the purchasers that the house could be heated for as little as $100 per year (a fact which proved far from accurate) and that the walls and ceiling were well insulated. She defended on the basis that she had received the information from the former owner and had no personal knowledge of any defects in the heating system. The Court, however, found her liable for the fraudulent misrepresentation even though her representation was innocent. The Court based its decision on the fact that although there was no deliberate deception on the part of the broker, she had displayed a facade of knowledge where, in fact, there was no actual knowledge. And this, in the Court’s view, *277 was tantamount to fraud. Id., 110 A.2d at 84.
Another striking example of the capacious view courts take in asserting broker liability concerns the question of “materiality.” Most courts hold that a matter is “material” if it is one that a reasonable person would attach importance to in determining his choice of action in the transaction in question. See, e.g., Lynn v. Taylor, 7 Kan. App. 369, 642 P.2d 131, 134 (1982). Indeed the standard for materiality in this area seems so broad that virtually all but the most minor defects are usually deemed “material.” Description of the soil condition, Rothstein v. Janss Investment Corp., 45 Cal. App. 2d 64, 113 P.2d 465 (1941); the existence of termites, Glanski v. Ervine, Pa. Super Ct., 409 A.2d 425 (1979); condition of the septic tank, Mertens v. Wolfeboro National Bank, 119 N.H. 453, 402 A.2d 1335 (1979); zoning of the property, Barnes v. Lopez, 25 Ariz. App. 477, 544 P.2d 694 (1976); and water problems in the basement, Sawyer v. Tildhalt, 275 Minn. 457, 148 N.W. 2d 131 (1967), have all been considered “material.”
Some courts have held that another element of a fraudulent misrepresentation claim requires that the defect be unknown or beyond the reach of the buyer. Courts taking this view have held that the concealed or latent defects could not be discovered by reasonable diligence. See, e.g., Lynn v. Taylor, 7 Kan. App. 369, 442 P.2d 131, 134 (1982); Glanski v. Ervine, Pa. Super 409 A.2d 425, 429 (1979). Others have interpreted this element to mean that the buyer has an affirmative obligation to use diligence in inspecting the property. Crum v. McCoy, 41 Ohio Misc. 34, 322 N.E.2d 161 (1974); Miles v. McSwegin, 58 Ohio St. 2d 97, 388 N.E.2d 1367 (1979). Still other courts have held that the existence of an “as is” clause in the contract creates an even greater affirmative obligation to conduct an investigation of the premises before purchase. See, e.g., Glanski v. Ervine, Pa. Super, 409 A.2d 425, 429 (1979). However, the majority of courts agree that the “as is” clause alone does not confer a general immunity from liability for fraud. See, e.g., Lingsch v. Savage, 213 Cal. App. 729, 29 Cal. Rptr. 201 § 8 ALR 3d 537 (1963). The rationale for such a holding is premised on the view that the “as is” clause is based on the knowledge that the buyer had at the time of the transaction, which knowledge was based on false representations or nondisclosures. Lingsch v. Savage, supra; see also, Wittenberg v. Robinson, 9 N.Y.2d 261, 213 N.Y. Super, 2d 430, 173, N.E.2d 868 (1961), where an agent’s misrepresentations respecting a heating plant were held actionable fraud even though a clause in the contract stated that the purchaser had made an independent investigation and was not relying on the agent.
The broker’s attempt to prove lack of inducement or reliance on the part of the purchaser is also usually unsuccessful. Most courts have held that a buyer has the right to rely on misrepresentations made by a broker. Maxwell v. Ratcliffe, 356 Mass. 560, 254 N.E.2d 250 (1969): Wilkie v. Conway, Inc., 257 Cal.App.2d 126, 64 Cal. Rptr. 845 (1967); Foxley Cattle Co. v. Bank of Mead, 196 Neb. 1, 241 N.W.2d 495 (1976).
We turn next to the emerging judicial view of imputation of liability against real estate brokers based on theories of negligence. It appears that in order to establish a successful claim for negligence against the broker, a plaintiff need only show the traditional elements of negligence: duty, breach of duty, and injury proximately resulting from such breach. Negligence obviously covers a much broader variety of activities than fraud since a broker may be found negligent without having Knowingly made any affirmative misrepresentations. Indeed some jurisdictions have fashioned a remedy known as negligent misrepresentation, which is very similar to fraud in nature, but is based on *278 negligence instead. This remedy has virtually eliminated the classic fraud requirements of materiality and knowledge. Where negligent misrepresentation is sought to be asserted, a plaintiff need only prove duty, breach of duty, and proximately caused injury.
A review of the cases shows that the typical negligent misrepresentation case arises when the broker simply relays to a buyer fraudulent or grossly inaccurate information that he receives from the seller without knowledge of its falsity. Although in such a case there is obviously no actual intent to deceive or misrepresent — the necessary element for a buyer — or prospective buyer— to succeed in a fraud action, some courts have held that the broker can be held to a duty to take reasonable steps to avoid disseminating false information to the buyer. Mertens v. Wolfeboro National Bank, 119 N.H. 453, 402 A2d 1335 (1979); First Church of the Open Bible v. Cline J. Dinton Realty, Inc., 19 Wash. App. 275, 574 P.2d 1211 (1978); Barnes v. Lopez 25 Ariz. App. 477, 544 P.2d 694 (1976).
A typical case illustrating this approach is Mertens v. Wolfeboro National Bank, supra. Here the property purchasers had asked the broker about the condition of a well and relied upon his representation that it was “okay” when they contracted to purchase the house. Subsequently, the buyers found that the system was unusable and sued the broker claiming that he was negligent in his representation that the system was “okay.” In holding that the broker was liable on ¿ theory of negligent misrepresentation, the Court stated that, “it is the duty of one who volunteers information to another and not having equal knowledge to exercise reasonable care to verify the truth of his statement before making them.” Id. at 1337.
The current standards of the evolving tort of negligent misrepresentation are set forth in the RESTATEMENT (SECOND) OF TORTS § 552:
One who, in the course of business profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information if he fails to exercise reasonable cause of competence in obtaining or communicating the information.
Thus, in this kind of case the real estate broker is subject to liability if he has failed to exercise the care or competence of a reasonable man in obtaining or communicating the information.[7]
A consideration of broker-imputed liability deriving from the presence of an agency relationship, an additional theory of evolving liability, brings us back to *279 context and considerations which lurk beneath the surface of (he present record. It is, of course, clear that a prospective purchaser may speeifiealh retain a broker to represent him in the acquisition of a piece of property. This situation occurs most frequently in the context of a prospective commercial real purchase. Such an arrangement, however, is rather unusual in the typical residential purchase where the broker is usually considered the agent of the seller.
Nevertheless, like the result sought to be achieved by Lacoille here, t here are increasing instances where the courts have found that a broker who has assisted the buyer in the purchase of real estate should be deemed an agent of the buyer and, therefore, owes him the fiduciary duties ofloyalty, fidelity, care, and disclosure.[8]
Although a finding of dual agency in every typical buyer, broker transact ion would create confusion on the part of the broker as to whose interest he really represents, an analysis of the case law reveals that, a buyer/broker agency is usually found only in those situations when the buyer is somehow “wronged" in the transaction and the Court has been able to find “special circumstances” present which would support the finding of agency. In the typical case, the broker has made some type of representation to the buyer which would support a finding that an agency relationship existed. For example, if the broker tells the buyer that “he is looking out for the buyers interest,” or otherwise affirmatively intimates that hisjob is to help the buyer, then a court, may find the broker to be the agent of the buyer. Thus,.in Brown v. Coates, 102 U.S. App. D.C. 300, 253 F.2d 36 (1958), plaintiffs first hired the real estate broker to sell their home but were persuaded by the broker to exchange their home for the one he showed them. When the plaintiffs hesitated during the negotiations, the broker assured them that they did not need a lawyer because he was one and “would take care of them.” The Court held that “in this situation, appellants had a right to rely on the competence, honesty and good faith of appellant, who assured them that he would regard their interest.” The Court found the broker to be an agent of the buyer, and hence he owed the buyer fiduciary duties. Id.., 253 F.2d at 38, 39. Similarly, statements by a broker such as “I am doing your dealings” and “I am taking care of everything” have been held by a court to have been evidence that there was an agency between the buyer and the broker. Grandchamp v. Patzer, 39 Mich. App. 350, 353, 197 N.W. 2d 537 (1972).
The Court in Spindler v. Kreiger, 16 Ill. App. 2d 131, 147 N.E.2d 457 (1958), also found that the facts were such to support a finding that an agency relationship existed on behalf of the buyer. In Spindler, plaintiff/purchaser informed a broker that he desired to purchase a particular piece of property in Peoria, Illinois. The broker then negotiated a purchase of the subject property in his own name at a price substantially less than the buyer was willing to pay. He then conveyed the property to the buyer at a higher price, keeping the difference for himself. In finding that the broker was the agent of the buyer, the Court placed particular emphasis on the fact that the defendant was a well known real estate broker who had represented the plaintiff on one prior occasion and that in various communications to the buyer, had indicated his *280 role as that of an agent whose sole purpose was to acquire the subject property for the buyer. Id,., 147 N.E.2d at 462.
In another case where the Court found the broker to be an agent of the buyer midst “special circumstances,” the buyer’s complete inability to understand the business aspects of a real estate transaction was apparently a pivotal factor in the Court’s determination. Fairfield Savings & Loan v. Kroll, 106 Ill. App.2d 296, 246 N.E.2d 327 (1969). In this case, the broker undertook to obtain a mortgage for the buyer and assisted her in financing the purchase. The buyer was the “type of woman who was easily confused in business matters.” Id., 246 N.E.2d at 330. The Court found that as a consequence of the broker’s awareness of the buyer’s inability to understand, he should have been particularly careful that the buyer was completely informed of everything that was going on so that she could be fully advised of her obligations at closing. The Court held that in view of the combination of all the facts and circumstances, coupled with the knowledge of the buyer’s inability to understand real estate transactions, the trial Court was justified in finding the existence of an agency relationship between buyer and broker. However, the Court stated that if the buyer had been a knowledgeable participant in the transaction, then'the trial court’s conclusion would not have been justified. Id., 246 N.E.2d at 331.
Thus, absent special circumstances, it appears that courts are not likely to find that the broker was acting as the buyer’s agent. The Court ih Urban Investments, Inc. v. Branham, 464 A.2d 93 (D.C. 1983) was confronted with such a claim, and found that the mere assertion that the broker was in a superior position by virtue of his status did not alone imply a fiduciary obligation. After reviewing two cases where circumstances existed which created an agency relationship, including Brown v. Coates, discussed supra, the Court examined the evidence and found that there was “no basis for a finding of special circumstances to remove the case from the general rule that the real estate broker must act for the exclusive benefit of the principal, and for that principal only.” Id., at 97.
A third theory of real estate broker liability — and the one of most direct relevance here — is neither strictly tort nor agency based. This theory is often characterized as a “public interest” or “public policy” approach. See The Duty of the Broker to Purchasers and Prospective Purchasers of Real Estate Property in Illinois, 69 ILLINOIS BAR JOURNAL, 260 (1981). The public policy approach apparently has its roots in state statutes or administrative regulations which regulate the real estate brokerage industry. Courts applying this theory reason that brokers owe duties to potential purchasers as members of the public because of the responsibilities that are imposed upon licensed real estate brokers by state statutes or regulatory strictures.
In Zichlin v. Dill, 157 Fla. 96, 25 So.2d 4 (1946), an early case which is often cited in support of the “public policy” approach, the broker allegedly had falsely told the buyer that the seller’s minimum price was $5,500. The broker then made a $1,000 secret profit by purchasing the property for himself with the buyer’s money and then reselling it to the buyer. On these facts the Supreme Court of Florida concluded that a real estate broker is an exception to the general rule that an agent is responsible only to his principal and reversed the lower court’s dismissal of the complaint. Central to its rationale was the reality that a real estate broker in Florida enjoyed statutory privileges with commensurate responsibilities, citing a statute that requires applicants for a brokerage license to be honest, trustworthy, fair, and of good character. The Court held that the state law, in effect, “granted brokers a form of monopoly, and in doing so, the old rule of caveat emptor is cast aside.” The *281 Court further found that "those dealing with a licensed broker may naturally assume that he possesses the requisites of an honest, ethical man.” Id,., 25 So.2d at 4-5.
In another frequently cited case, Ward v. Taggart, 51 Cal.2d 736, 336 P.2d 534 (1959), a real estate broker'misrepresented to a prospective buyer both the seller’s minimum price, and that the broker was the seller’s agent. The broker then used the buyer’s money to purchase the property himself. He then resold it to the buyer at a profit. Conceding the absence of a fiduciary or agency relationship between the broker and the buyer, the Court, nonetheless, held that public policy would not allow the broker to fraudulently take advantage of a potential buyer. Relying on certain California statutes dealing with real estate brokers and fraudulent conduct, the Court found that a licensed real estate broker has “a duty to be honest and truthful in his dealings.” Id., 336 P.2d at 537.
In a similar vein, a number of jurisdictions have held the broker liable to a purchaser based on privileges and obligations deriving from state statutes and administrative regulations regulating the brokerage industry. Generally, courts applying this theory have found that a licensed real estate agent is expected to be honest, ethical, and competent and is thus answerable at law for breaches of his statutory or regulatory duty to the public. Indeed, at least one jurisdiction has held that the statutes regulating the real estate brokerage industry have actually created a private right of action by the purchaser against the broker. Sawyer Realty Group, Inc. v. Jarvis, 89 Ill.2d 379, 59 Ill. Dec. 905 432 N.E.2d 49 (1982)[9]. Another group of courts have used the “public policy” theory to open the way for recognition of a more traditional though broader basis of recovery. Dugan v. Jones, Utah, 615 P.2d 1239 (1980); Hagar v. Mobley, 638 P.2d 127 (1981); McCarthy v. Lincoln Green, Inc., 620 P.2d 1221 (1980). Still other courts have found that public policy demanded that the real estate broker be deemed to be in a strict fiduciary relationship with the purchaser. Quinn v. Phipps, 93 Fla. 805, 113 So. 419 (1927); Funk v. Tifft, 515 F.2d 23 (1975); Bush v. Palermo Realty Inc., 443 So.2d 104 (Fla. Dist. Ct. App. (1983).
This line of cases which also tends to predicate broker liability on “public policy” considerations has found that the broker occupies a fiduciary relationship with the prospective purchaser. In Quinn v. Phipps, supra, an early case which applied such a theory of recovery, the Court reasoned that since a real estate broker invites public confidence, a fiduciary relationship should be found whenever influence is acquired and abused or confidence is reposed or betrayed. In that case, by concealing the buyer’s $50,000 offer and purchasing the property for himself for $45,000, the Court found that the broker had breached a fiduciary duty to the buyer. The Court, however, stopped short of calling the broker the buyer’s agent. Id., 113 So. at 424.
Another relatively modern decision has followed Quinn and held that the broker occupies a fiduciary relationship with the buyer. In Funk v. Tifft, supra, a divided Ninth Circuit, over a strong dissent, also found that the *282 broker was in a fiduciary relationship with prospective purchasers, citing Quinn with approval. In that case, the prospective purchasers were shown a certain piece of property listed with the defendant broker’s agency and subsequently signed a purchase agreement. The broker mailed the buyers’ offer, but before the owner received that offer, the broker called the owner and put in his own bid on the property. The owner accepted the broker’s bid. A month later, the broker informed the prospective purchasers that their offer had been rejected. Upon learning that the broker had purchased the property, a suit ensued against the broker. The Ninth Circuit Court of Appeals reversed the District Court’s dismissal of the complaint and held that the defendant, as a licensed real estate broker, had a “fiduciary duty” to deal fairly and honestly with a prospective purchaser. By outbidding such a prospective purchaser without giving notice to them before the seller had acted on their offer, the Court held that the broker had breached a fiduciary duty to the buyers. 515 F.2d at 25[10].
It is interesting to note that although the term “fiduciary” appears with increasing frequency in treating the real estate broker-buyer relationship, the meaning of fiduciary seems to have a less duty-charged or fidelity-freighted connotation than when used in the more traditional areas of trustee or agency law. Indeed, in Quinn, supra, the Court expressly found that there was no agency relationship between the buyer and the broker. Id., 113 So. at 424. In this context, rather than insisting on the outermost limits of fidelity and-exactitude, it appears that courts are invoking the term “fiduciary” to connote a more basic and elemental standard of “fairness” — a standard which requires that a broker be fair and honest with a prospective purchaser. This approach is evidenced by the decision in Bush v. Palermo Realty Incorporated, 443 So.2d 104 [Fla. Dist. Ct. App. (1983) ]. There, in the course of a decision in which the Court found that the broker was in a fiduciary relationship with the buyer, the Court took pains to define its concept of fiduciary, in this context, by quoting Judge Cardozo who stated:
Many forms of conduct permissible in a workaday world for those acting at arms length are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace, not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this, there has developed a tradition that is unbending and inveterate . .. only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. [Citing Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546 (1928) ].
At bottom, wh at emerges from a review of cases in this area is that courts are insisting on a generalized and elemental standard of honesty and fair dealing on the part of a broker towards a prospective purchaser. Utilizing the rubric *283 of the fiduciary relationship, courts are insisting that brokers must deal honestly and fairly with a prospective purchaser but stopping short of insisting on imperatives which transcend that standard. In this regard, we place great emphasis on Ries v. Rome, 337 Mass. 376 (1958) in which the Supreme Judicial Court held that a broker was under no duty to treat information supplied by a prospective purchaser as confidential. In that case a prospective purchaser of property communicated certain information relative to the property and his plans for its expansion and development to the owner’s broker. The broker then disclosed the information to another prospective purchaser to whom the owner, through the broker, ultimately sold the property. The Court in reaching this result noted that the broker was not shown to have agreed to treat the information as confidential and as agent for the owner could not properly have so agreed.
We believe that it is this generalized standard of fairness by which the broker’s activities must be tested. And, it is this same standard which must guide analysis in assaying whether the trial court properly granted the motion to dismiss of Lacoille’s complaint asserting the putative interference with prospective advantageous contractual relations.
As a starting point, and under well settled agency principles, it is clear that the broker was the nominal agent of the seller under the original written listing agreement. Cf. Ries v. Rome, supra. This means that he was not entitled to enter into an express and avowed agency relationship with the potential buyer (to act on behalf of the buyer) without the buyer’s consent and the informed consent of the seller. On this record there is no indication that the broker made any affirmative representations to Lacoille that he would be seeking to advance Lacoille’s interests in a more particularized or aggressive fashion than would normally obtain in the usual (and, concededly, emerging) seller-broker-buyer relationship. Neither was there any evidence of a protracted course of conduct in which the broker had represented Lacoille’s interests in the past from which more sensitized and freighted “fiduciary” obligations might have flowed. Finally, there was nothing to suggest that Lacoille was so devoid of financial and commercial sophistication as to render him a “babe in the woods” in the commercial marketplace, with whatever additional representational imperatives might derive from a demonstrable case of such naivete.
Incident to his obligation to the seller to market the property, the broker presented the property to Lacoille. As initimated above, there is absolutely no indication that Lacoille sought to employ the broker to represent him or to pay for the broker’s services for advice or to appraise the property. What appears is that the broker displayed the property, identified its attributes, and described the terms and conditions of the owner’s offer to sell, all of which activities were appropriate to the agency established with the owner.
Next, the broker received Lacoille’s offer, and, consistent with the agency, presented such offer to the seller. At this initial stage — at the time of the “original” offer — nothing in the pleadings suggest that Lacoille had provided the broker with any authorization to modify the offer or to otherwise negotiate on his behalf. (Had the broker accepted such authorization, a different case would be presented).
What followed sequentially was that Lacoille’s offer was rejected by the owner. There is no indication that the broker induced the owner to reject the offer so that he could take advantage of it or any suggestion there was any delay in its submission to the owner, or any diminished consideration by the owner, attributable to the broker. In this regard, as seen above, the broker *284 had an affirmative obligation to submit all offers and would have been obligated to submit any offer received from any other prospective purchaser (albeit there .is no indication that any other offer was received). Following this; the broker reported to Lacoille the owner’s rejection of his offer. Again, there is np indication that this report was inaccurate or untimely.
Of course, central to Lacoille’s assertions of unfairness grounding the claim of alleged interference with contractual relations is the Broker’s treatment of his “second offer.” As noted previously, Lacoille’s initial bid of $25,000.00 was made on June 23, 1982 and rejected by the seller on July 6,' 1982. Lacoille made no attempt to raise his bid subsequent to the rejection, nor did he even resubmit his original bid until August 15,1982. after he was solicited to make another bid by the broker. And, most significantly, Lacoille’s “second offer”— when it did come — scarcely constituted a meaningful “counteroffer.” The second offer was a direction to the broker to simply “resubmit” the original offer, but, now, with the additional term that the seller be responsible for paying for the then ongoing survey of the property. This “second” offer was never formalized in writing nor accompanied by a deposit. In any calculus of generalized “fairness” considerations, what the broker, in effect, was presented with when he solicited Lacoille for a bona fide counteroffer was a submission which, in practical result, was less than the offer which had been previously rejected by the seller a little more than a month earlier. What emerges clearly, when focus is delimited to this period of negotiation and not from the always rosy vantage point of hindsight, is that Lacoille, for practical purposes, had placed a ceiling of $25,000.00 on the value of the property to him. From all that appears from the face of the complaint before us, there is nothing to infer that Lacoille was willing to go even one dollar higher with his offering price, but, again, was proferring a defacto reduced “bottom line” submission to the seller as his “counteroffer” when solicited by the broker. Under the circumstances of this case, we question whether Lacoille had made a “counteroffer” which the broker was under an obligation to transmit at the peril of incurring legal liabilities deriving from a putative breach of the ethics of the real estate brokerage profession, relevant state licensing laws or, of direct relevance here, asserted allegations of interference with advantageous contractual relationships[11].
We believe that on the pleadings before the trial judge, that the essential responsibilities of the broker were satisfied and that Lacoille had no right to expect the broker would not continue to market the property. Given the performance of the broker with respect to the transmission of Lacoille’s *285 original offer, the fundamental issue presented appears to be whether the broker was or should be legally foreclosed from buying for his own account a property listed with him where by virtue of his status as a broker he has special knowledge of the outstanding offers on the property and their likely disposition. We believe that this question should be answered in the negative. Cf. Ries v. Rome, supra. It appears to us that the critical question, in this context, is whether full disclosure is made to the owner of the property (here the seller) not to the prospective purchaser coupled with proof that the broker has submitted all valid and viable offers received in timely fashion and ■strictly- in accordance with the putative purchasers’ instructions. This appears to be the thrust of relevant state licensing codes as well as the duty imposed'by the professions internal code of ethics. Indeed it appears that the right of the broker to purchase for his own account appears indispensable to the achievement of the owner’s interest in obtaining the best price, best terms, and the quickest sale since the broker may, on occasion, be the best if not the only market for the property[12].
In summary, on the facts of this record, we believe that the broker was under no obligation to reveal his offer to purchase to Lacoille where Lacoille’s offer had already been rejected. Under the circumstances of this case,in view of the economic determination which Lacoille had arrived at relative to the amount he would offer for the property, the plaintiff does not appear to have been" dí'sádvantaged in any way by submitting his offer through the broker and, hence, there appears to be no violation of his duty of honesty and fairness. Lacoille’s complaint did not allege a cause of action for interference with advantageous contractual relations and the trial judge was correct in dismissing the Count of the Complaint which asserted this allegation.
We turn, then, briefly to Lacoille’s claim under G.L. c. 93A, § 11. Lacoille asserts that the broker’s conduct, as outlined above constitutes unfair and deceptive practices and an unfair method of competition within the meaning of the statute. Both Lacoille and the broker, in their respective briefs, focus on the issue of whether any damage has in fact been inflicted. It is not necessary that we address the question of damages because, on this record, we do not find a deceptive act or practice within the ambit of the statute.
“Whether a given practice is unfair or deceptive must be determined from the circumstances of each case.” Don Lorenz, Inc,, v. Northampton National Bank, 6 Mass. App. 929 (1978). As our previous discussions indicate, it is the thrust of Lacoille’s position that the broker unfairly competed, used inside information to keep him from making a higher offer, attempted to, and, *286 ultimately, succeeded in utilizing him to make their own offer and their own self-dealing seem legitimate in the eyes of the seller. These allegations might indeed be actionable if there was any support for them. However, nowhere on the face of the complaint, the allied papers or reasonable inferences flowing from them, is there support for this position. Nowhere in the complaint has Lacoille alleged that the broker prevented him from making a higher offer breaching his fiduciary duty to the seller. Nor may this conclusion be reasonably inferred.
As we have indicated above, Lacoille’s initial bid of $25,000.00 was made on June 23,1982 and rejected on July 6,1982. Lacoille made no attempt to raise his bid subsequent to the rejection, nor did he even re-submit his original bid until August 15, 1982, after solicitation by Dulong. Again, as we have intimated, the only reasonable inference from these facts is that Lacoille had placed a ceiling of $25,000.00 on the value of the property to him. This court would be indulging in pure speculation were it to infer that Lacoille was willing to go even one dollar higher with his offering price.
Thus, the only remaining possible conduct actionable would be the broker’s use of information given to it by Lacoille for its own competitive advantage. As has already been shown, however, absent special circumstances not present here, conduct of this type is legitimate in the real estate industry. See, Ries v. Rome, supra. For all of the above reasons, we hold that the broker has not violated G.L. c. 93A, § 11.
For all of the above reasons, we conclude that the action of the trial court in granting Dulong’s motion to dismiss the complaint was not in error and that the action should be affirmed. It is so ordered.

Although the principles enunciated above appear to apply interchangably to cases styled variously as interferences with contractual relations, prospective contractual relations or advantageous relations, there is authority distinguishing the torts. In NOLAN, TORT LAW § 72 (1979), it is suggested that interference with contractual relations is a “distinctly different tort” from interference with advantageous relations. The prospective contractual relations tort is less well defined than either of the other two. Nevertheless, prospective contractual relations long have been treated as abranch of the tort of interference with ad vantageous relations. For example, cases arising in the context of labor-management disputes, including blacklist and boycott activities, present situations where inducement to refrain from contracting is styled an intentional interference with advantageous relations. See, e.g., Aarco, Inc. v. Baynes, 391 Mass. 560 (1984).

 According to NOLAN, TORT LAW § 71, in substance, all the elements listed above must be alleged in order to state a claim for intentional interference with advantageous relations except the requirement of a “legally protected interest” is replaced by the less stringent standard of “a business relationship,” or, contemplated contract of economic benefit, in the prospective contractual context. See, Conway v. O'Brien, 269 Mass. 425 (1929). The latter criteria does not require a plaintiff to prove a present contractual interference. Morasse v. Brochu, 151 Mass. 567 (1890). In Ryan, Elliott & Co., Inc. v. Legatt, McCall & Werner, Inc., 8 Mass. App. Ct. 686, 689 (1979), the Appeals Court cited with approval the formulation of the law on interference with advantageous relations set forth in RESTATEMENT OF TORTS § 766. “One who without privilege to do so, induces or otherwise purposefully causes athird person not to ... enter Into or continue a business relation with another is liable to the other for the harm caused thereby." (emphasis added); Citing, Owen v. William, 322 Mass. 356 (1948). Again, even a probable future business relationship, with a reasonable expectancy of financial benefit, is enough to satisfy the tort of intentional interference with advantageous relations. Id.

“This last qualification is captured in the law by the term ‘intention to create legdl relations.’ The term as it stands is misleading. No one supposes that two merchants who make a deal must entertain some additional intention to create legal relations in order for that deal to be binding in lav/. On the other hand, given the consensual basis of contract as promise, the parties should in principle be free to exclude legal enforcement so long as this is not a fraudulent device to trap the unwary. See, e.g., Spooner v. Reserve Life Insurance, 47 Wash.2d 454, 287 P.2d 735 (1955). In a particular case it may be a difficult problem of interpretation whether such a purpose is fairly to be implied. In a particular case, it will be a task for interpretation to determine whether legal enforcement would not do violence to the intention of the parties — as with so-called social promises. See HENRY HART AND ALBERT SACKS. The Invitation to Dinner Case, THE LEGAL PROCESS 477-478 (Tentative ed., Cambridge, 1958). And legal enforcement may violate the understanding of one (Westmoreland County Ct. Pa. 1795), and chapter 5 infra.” See, FRIED, CONTRACT AS PROMISE, Harvard Univ. Press (1981) at pg. 38 (fn.)

Indeed a striking indicia of the metamorphosis obtaining in this area has been the internal changes effectuated by the real estate industry itself by its self-policing mechanisms. For example, The National Assocation of Realtors, in its CODE OF ETHICS, has a number of provisions which recognize that the public interest in the manner and means by which people buy and sell real property conspicuously transcend the vestigial caveat emptor standard. It appears that no less than 14 of the 23 Articles of that Code are concerned with avoiding conflicts of interest, misrepresentation, overreaching, and misplaced reliance in brokers dealing with their clients and customers. See, e.g.:
ARTICLE 7
In accepting employment as an agent, the REALTOR pledges himself to protect and promote the interests of the client. This obligation of absolute fidelity to the client’s interest is primary, but it does not relieve the REALTOR of his obligation to treat fairly all parties to the transaction.

ARTICLE 9
The REALTOR shall avoid exaggeration, misrepresentation, or concealment of the pertinent facts. He has an affirmative obligation to discover adverse factors that a reasonably competent and diligent investigation would disclose.
XXX
ARTICLE 12
The REALTOR shall not undertake to provide professional services concerning a property or its value where he has a present or contemplated interest, unless such interest is specifically disclosed to all affected parties.

ARTICLE 16
When acting as agent, the REALTOR shall not accept any commission, rebate, or profit on expenditures made for his principal-owner, without the principal’s knowledge and consent.
XXX
ARTICLE 20
The REALTOR for the protection of all parties, shall see that financial obligations and commitments regarding real estate transactions are in writing, expressing the exact agreement of the parties. A copy of each agreement shall be furnished to each party upon his signing such agreement. See CODE OF ETHICS, NATIONAL ASSOCIATION OF REALTORS (8th Edition) (1983).

Although the theory of negligent misrepresentation has often been applied to cases where it is alleged that the seller is liable for his misrepresentations, McCarthey v. Barrows, 384 A.2d 787 (N.H. 1978); Roy H. Long Realty Co. v. Vanderkolk, 26 Ariz. App. 266, 547 P.2d 479 (1976); Merkley v. MacPhersons, Inc., 69 Wash.2d 776, 420 P.2d 205 (1966), a court that finds seller liability does not always find corresponding broker liability. In Lyons v. Christ Episcopal Church, 71 Ill. App.3d 257, 27 Ill. Dec. 559, 389 N.E.2d 623 (1979), the sellers told the broker that the house was connected to a sewer system, when in fact it was connected to a septic tank. In turn, the agent passed this information on to the buyer. Later, when the buyer found out that there was no sewer connection, he sued both the seller and the broker, alleging that they were negligent in their representation of how the house was connected. The Court of Appeals allowed recovery against the sellers, but sustained the trial court’s dismissal of the broker. It based its decision on the belief that a broker "has no duty to prospective purchasers to independently substantiate the representation of a disclosed seller unless he is aware of facts that indicate such a representation is false.” Id. 389 N.E.2d at 625. Thus, the Court refused to recognize that the tort of negligent misrepresentation applied to real estate brokers. But see, Tennant v. Lawton, 26 Wash. App. 201, 615 P.2d 1305 (1980) where, in a similar context, the Court upheld broker liability. There it was held: “that the broker is required to employ a reasonable degree of effort and professional expertise to conform or refute any information from the seller that he knows or should know, is pivotal to the transaction from the buyer’s perspective.” Id. 615 P.2d 1310.

Such a result creates the dilemma of dual agency, for the broker and/or cooperating broker, who clearly have fiduciary duties to the seller, is held to have fiduciary obligations to the buyer as well. Such a dual agency situation, although permitted by law provided both principals consent to the arangement after disclosure by the agent, RESTATEMENT (SECOND) OF AGENCY § 392 (1958); Bonaccoroso v. Kaplan, 218 Cal. A pp.2d 63, 68, 32 Cal. Rptr. 69, 72 (1963), creates obvious conflicts of interest.

In Sawyer Realty Group Incorporated v. Jarvis, supra, á prospective purchaser wished to buy a parcel of property and submitted an offer to the defendant broker along with an earnest money deposit. Instead of relaying the offer to the seller for his approval, the broker concealed the offer and purchased the property for himself. The buyer asserted a claim against the broker based on an alleged violation of the state's brokerage licensing act for alleged misrepresentations and concealment of information. After reviewing the provisions of the act, as well as its statutory history, the Court found that the purpose of the statutory regulations was to insure the protection of the public in dealing with brokers and salesmen. Based on these findings, it held that the licensing statute created a private right of action under which the purchaser could sue for damages. Id., 432 N.E.2d at 854.

In contrast, the dissenting opinion denied the existence of a fiduciary relationship and stated that “neither precedent nor the findings of the District Court supported the Court’s finding of a fiduciary duty or breach." 515 F.2d at 27. Decisions from other jurisdictions were cited for the proposition that “a broker for the seller can, with the seller’s knowledge, outbid prospective buyers...." [Significantly, the cases relied upon by the dissenting judge were Masaschusetts cases: Ries v. Rome, 337 Mass. 376, 149 N.E 2d 336 (1958); DiBurro v. Bonasia, 321 Mass. 12, 71 N.E.2d 401 (1947) ] The cases relied upon by the majority were distinguished on the ground that they involved situations in which the broker was the buyer’s agent, made affirmative misrepresentations, or underbid the prospective buyer's offer for the property. The dissent concluded that “(w)here the broker is not t lie agent of the prospective buyer, where he acts with the knowledge of his principal, (lie seller, where there is no misuse of confidential information, where there is no fraudulent misrepresentation, and where the broker bids more than any of the prospective buyers, there should be no liability on the part of the broker if the.seller chooses to accept his offer without asking lor another round of bids.” Id. at 28.

Assuming, arguendo, that the casual directive following broker’s solicitation to “resubmit” the orginal offer (with the added and onerous condition) was a valid and viable counteroffer, there is no indication that this submission was not submitted to the seller. On this record, there is no indication as to whether or not the Brokers made their own offer before or after Lacoille’s “counteroffer.” Had there been a valid counteroffer on behalf of Lacoille, — one which required transmittal at the broker’s peril — a situation, as suggested we do not find here, then this sequence would be significant. For in that situation, the broker, m our view, would have had no right to delay transmission of the valid counteroffer in order to induce acceptance of their own offer. While we express no opinion on whether concealment of a counteroffer in order to gain acceptance of the broker’s offer constitutes a breach of “fiduciary” duty, in Massachusetts, compare, Quinn and Funk, supra, with Ries v. Rome, supra, we do believe that it would constitute a breach of “public policy and the internal Canons of the real estate brokerage profession, which require brokers to dealfairly and honestly with prospective purchasers. Finally, although we determine that under the circumstances of this case the broker had a range of defensible discretion — immune from legal liability — as to whether he was constrained to transmit the "second offer,” however casually originated and articulated by the prospective purchaser, undoubtedly, it would be the better practice for brokers to submit all offers to the owners of property. We simply hold that where the asserted counteroffer can be reasonably and defensibly viewed as non-efficacious from the viewpoint of the broker, that the failure to transmit such a submission will not generate legal liability.

We note that in this ease the seller was in no way prejudiced by the brokers activities since the seller actually received a higher amount for the property deriving from the fact it obviously did not have to pay a commission to the broker which would have been required if the seller had accepted Lacoille’s original offer. We believe it is important to make clear that while a broker is not per sc foreclosed from purchasing for his own account a property, he has listed, dearl> the broker cannot interfere with a prospective purchaser, in the sense of suppressing or delaying t he t ransmission of a bona fide and viable offer (or “counteroffer" — a situation as intimated above we find missing here) in order to obtain the property himself. Such conduct would indeed constitute a breach of his "fiduciary" duty to the seller and, in our opinion, would be a violation of his dut> of fair and honest dealing to the purchaser. But, of course, the question remains whether or not under what circumstances a broker is obligated to disclose his intent to purchase where no interference is involved. It is our view that where a broker makes an offer to purchase on his own account, or has his own offer outstanding at the same time he is requested to submit an offer on behalf of a prospective purchaser, it is the better practice to disclose that fact to the prospective purchaser. It seems to us in that situation the prospective purchaser then has the opportunity to judge whether the offer may best be presented through the broker directly to the seller or through another intermediary. On the other hand, we do not believe such an allegation of disclosure is necessary when the offer by the broker to purchase for his own account is made after the offer he has submitted on behalf of the prospective purchaser has been submitted and rejected — the situation we find presented on the instant record.