11 Cal.App.3d 680 (1970)
90 Cal. Rptr. 66
Estate of VIOLETTA L. HORTON, Deceased.
ROBERT B. BURCH, JR., as Trustee, etc., et al., Petitioners and Respondents,
v.
RICHARD LEE BRADLEY, Claimant and Respondent.
THOMAS C. LYNCH, as Attorney General, etc., Objector and Appellant.
Docket No. 10154.
Court of Appeals of California, Fourth District, Division One.
September 28, 1970.
*682 COUNSEL
Thomas C. Lynch, Attorney General, Carl Boronkay and John C. Hamilton, Deputy Attorneys General, for Objector and Appellant.
Truce, Veal & Jackson, Harlan K. Veal, Todd & Toothacre, Rod M. Toothacre and John R. Wingert for Claimant and Respondent.
Vincent E. Whelan for Petitioners and Respondents.
OPINION
BROWN (Gerald), P.J.
The Attorney General appeals from an order instructing trustees, amending orders of distribution nunc pro tunc and *683 modifying a testamentary trust under the cy pres doctrine, which the court entered following stipulation of an individual life beneficiary of the trust and four charitable beneficiaries.
The testamentary trust involved in this litigation was established by a will drafted in 1949 and admitted to probate in 1958. The will directed payment of $40,000 a year to the individual beneficiary, respondent Richard Lee Bradley, for the term of his life. Upon Bradley's death, the residue and remainder of the trust was to be paid, one third to Stanford University to find the cause and cure for poliomyelitis, one third to the Claremont Colleges for educational purposes, one sixth to the First Church of Christ Scientist for religious and charitable purposes and one sixth to the Society for Crippled Children of San Diego County for the furtherance of their work.
The will contained no express provision for accumulation or disposition of income in excess of the $40,000 a year payment to Bradley during his lifetime.
In 1959 the court entered an order settling the first account of the executors of the will and making a distribution. In 1960 the court entered an order settling the executors' second and final account, report of executors, for fees and ordering distribution of the estate and discharge of the executors. The orders contained no provision for accumulation or distribution of excess income.
The income from the trust assets far exceeded the $40,000 yearly payments to Bradley. By August 1969, the trust had accumulated $722,566.80 excess income.
Sometime during midyear 1968, the charity beneficiaries and Bradley began negotiations concerning their respective rights under the trust and their entitlement to the accumulated income. These negotiations continued for 14 or 15 months. The charities wanted present distribution of excess income, both accumulated and future, to them. Bradley contended he was entitled to all, or a portion of the accumulation and also contended the intent of the testator was he receive an amount of income equal to the purchasing power of $40,000 on the date of testator's death.
The full contentions of the respective parties during their negotiations and the legal theories advanced to support the bargaining positions of the respective parties are not part of the record for the reason they resolved their differences outside the courtroom. It is apparent, however, much of the dispute centered around whether the will contained an implied direction to accumulate and whether the gift to Stanford, limited to finding the cause and cure of poliomyelitis, was affected by the spectacular advances in that area which *684 had occurred. The Attorney General was not a party to the negotiations or the agreement resolving the dispute.
In August 1969, the trustees of the trust petitioned the court for an order amending the orders for distribution nunc pro tunc, for instructions regarding distribution of income and for an order modifying the trust under the doctrine of cy pres. The Attorney General, having been served with a copy of the petition, answered and appeared at the hearing.
The charities and Bradley submitted an order to the court to which they had all stipulated when the matter was called for hearing. The stipulated order provided the accumulated $722,566.80 be distributed to the charities in the proportions they were to share in the residue. Future accumulations of excess income were to be distributed to the charities annually in like shares. Bradley's annual share of the income was to be computed according to a formula so he would receive after 1969 an amount equal to the purchasing power of $40,000 in 1957, but never more than 40 percent of the net income earned by the trust and never less than $40,000. The purpose for which Stanford could use its gifts was expanded to include finding the cause and cure of poliomyelitis and other virus diseases in man bearing a resemblance to poliomyelitis.
The Attorney General objects to the stipulated order only insofar as it modifies the entitlement to Bradley.
(1) It would be unjust, on the Attorney General's appeal, to approve of those parts of the agreed order benefitting the charities while disapproving the agreed consideration for those benefits, the modification of Bradley's share. The order, being based upon a compromise agreement, is not subject to approval in part and disapproval in other parts on this appeal.
We have concluded, however, the stipulated order should be affirmed in its entirety. The Attorney General contends the order of the court is void, as it relates to Bradley, because it exceeds the scope of the pleadings inasmuch as the trustees' petition did not mention modification of Bradley's entitlement. He also argues the decrees of distribution are res judicata and foreclose Bradley from obtaining a reinterpretation of the will. (2) Both contentions must fail as the order is not based upon the pleadings or upon facts presented in evidence upon which res judicata might operate. The order is based upon the stipulation of the charities and Bradley which represents a compromise agreement resolving their dispute. Agreements settling litigation are favored by the courts.
A charitable corporation may "do any and all things which a natural person may do necessary or desirable for the general purpose for which the corporation is organized" (Corp. Code, § 10206, subd. (h)). No doubt it may *685 become "necessary or desirable" for a charity to compromise litigation when it becomes involved in a good faith dispute which may affect its assets, or, in this case, its expectancies.
(3) To what extent must the Attorney General be involved in the negotiations and contractual undertaking of a charity? The role of the Attorney General is as an overseer of charities representing the public, the ultimate beneficiary of the charitable trust (Holt v. College of Osteopathic Physicians & Surgeons, 61 Cal.2d 750, 754 [40 Cal. Rptr. 244, 394 P.2d 932]). (4) His duty is to remedy abuses in trust management (People v. Cogswell, 113 Cal. 129, 136 [45 P. 270]). (5) He is a necessary party to proceedings affecting the disposition of the assets of a charitable trust (In re L.A. County Pioneer Society, 40 Cal.2d 852, 861 [257 P.2d 1]). It is his right and duty to participate in proceedings to protect charitable gifts (Estate of Quinn, 156 Cal. App.2d 684, 690 [320 P.2d 219]).
We are cited no statutory or case law authority placing the Attorney General in the position of a super administrator of charities with control over, or right to participate in, the contractual undertakings of the charities. (6) He has undoubted standing to seek redress in the courts of contracts entered into by charities which are collusive, tainted by fraud or which demonstrate any abuse of trust management. The Attorney General thus had standing in this case to object to the court signing the stipulated order. The question is did the court abuse its discretion in approving the compromise?
The charities benefitted from this agreement by gaining a present distribution of accumulated income and an annual distribution of future excess income. Stanford gained expanded uses to which it could apply its funds. The charities obviated litigation which might have prevented them from enjoying these benefits or might have impaired or defeated their entitlement to income at all. The Attorney General tacitly concedes benefit to the charities, as he does not ask the portions of the order conferring them to be reversed.
The Attorney General argues the merits of the attacks Bradley conceivably might make on the trust and construction of the will setting it up. The remedies he might have had are not before us on their merits. It is the merit of the compromise which concerned the court below and which now concerns us.
(7) Based on the record before us, we cannot say the charities' compromise of Bradley's claims was an exercise of poor business judgment, much more an abuse in trust management. It is apparent competent legal counsel negotiated long and hard to arrive at the compromise. Because he was not a *686 necessary party to the contract settling the differences of the parties, it follows the Attorney General had no veto power over the compromise.
Absent a showing of fraud, collusion or other factor demonstrating an abuse of trust management by the charities, we hold the court below did not abuse its discretion in allowing the compromise and signing the stipulated order.
(8) The Attorney General contends the court could not enter the stipulated order nunc pro tunc. He does not object to the entry of the nunc pro tunc order insofar as it benefits the charities. Insofar as it affects Bradley's entitlement, the order operates prospectively. Furthermore, the order is based on the stipulation of the parties and we find no prejudice to the Attorney General's interest caused by labeling the order nunc pro tunc.
The Attorney General contends the stipulated order constitutes a diversion of trust funds to which the charities could not stipulate. He relies on Estate of Quinn, supra, 156 Cal. App.2d 684. In that case the court held charities whose interests in trust funds had not vested because the court could change beneficiaries under a will leaving funds to "go to charity," could not enter into a compromise agreement with individual heirs allowing some of the funds to go to them. Here the interests of the charities have vested. They could thus handle their entitlements "[to] do any and all things which a natural person may do necessary or desirable for the general purpose" of their organizations. (Corp. Code, § 10206, subd. (h).)
(9) Not every expenditure of a charity goes directly to finance its objective. Where a charity, for a valuable consideration, expends funds for purposes necessary or desirable to its general purpose, such does not constitute an impermissible diversion of trust funds.
Order affirmed.
Coughlin, J., and Ault, J., concurred.
Appellant's petition for a hearing by the Supreme Court was denied December 17, 1970.