Bruce M. BOTELHO, Attorney General State of Alaska, Bruce M. Botelho, Attorney General on behalf of the members of Alaskan Sports Bingo Joint Venture, Anchorage Sports Association, Inc., Bartlett High School Boys' Basketball Booster Club, Chugiak High School Boys' Basketball Booster Club; Mat–Su Crime Stoppers, Inc., and Triam Sports Association, Inc.; the members of the Lucky Strike Bingo Joint Venture, Alaska Dance Theater, Inc., Cook Inlet Darting Club, Victims for Justice; the following members of the Northern Lights Gaming Co–Op, Alaska Center for the Environment, Alaska Laborers' Training School, Barrier Free Recreation, Mabel T. Caverly Senior Center, Inc., and West High Athletic Alumni; and the Public of the State of Alaska, Petitioners,

v.

Mark and Sue GRIFFIN, husband and wife, in their personal capacity, and d.b.a. Alaska Bingo Supply, Inc.; Alaska Bingo Management; Bingo Management, Inc.; Griffco, Inc.; Hot Rods; Management Company; and The Alaska Charitable Gaming ASSOCIATION, INC., Respondents.

Mark Griffin, Individually, and Sue Griffin, Individually, as Husband and Wife, Third–Party Petitioners,

v.

Stephen C. (Neil) Slotnick, Individually, and Larry E. Meyers, Individually, Third–Party Respondents.

No. S–9535.

Supreme Court of Alaska.

June 22, 2001.

690

Dan N. Branch, Assistant Attorney General, Bruce M. Botelho, Attorney General, Juneau, for Petitioners.

Laurel J. Peterson, Laurel J. Peterson, P.C., Anchorage, for Respondents and Third–Party Petitioners Mark and Sue Griffin, and Respondents Alaska Bingo Management, Griffco, Inc., Hot Rods, and Management Company.

Diane F. Vallentine, Natasha M. Summit, Jermain, Dunnagan & Owens, P.C., Anchorage, for Respondent Alaska Bingo Supply, Inc.

Terry C. Aglietti, Aglietti & Offret, Anchorage, for Respondent Alaska Charitable Gaming Association, Inc.

Before MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

### OPINION

MATTHEWS, Justice.

## I. INTRODUCTION

The Alaska attorney general filed suit against Mark and Sue Griffin on behalf of various charitable organizations, alleging that the Griffins had violated the state's gaming laws by charging the charities unreasonably high expenses. Citing this court's decision in *State v. First National Bank of Anchorage*,[1] the superior court held that the attorney general could not maintain damages claims on the charities' behalf without their consent. As most of the affected charities had dismissed or compromised their claims against the Griffins, the superior court granted the Griffins summary judgment on those claims. Because the attorney general's authority to enforce charitable trusts gives him the power to assert a charity's cause of action if the charity dismisses or compromises a claim against a third party for less than the amount the charity is owed under the state's gaming laws, we hold that the superior court

erred in granting summary judgment against the state.

## II. FACTS AND PROCEEDINGS

Alaska law permits qualified organizations to join together and conduct charitable gaming as Multiple–Beneficiary–Permittees ("MBPs").[2] This case centers upon two MBPs, both formed in 1995: Frontier Bingo Joint Venture, later renamed Alaska Sports Joint Bingo Venture ("Alaska Sports"), and Northern Lights Gaming Co–Op ("Northern Lights").[3] Respondents concede that Sue Griffin was the manager of Alaska Sports' and Northern Lights' gaming operations, and that the MBPs purchased gaming supplies and leased facilities from Alaska Bingo Supply, Inc., which was owned by Mark Griffin.

In September 1998 the Alaska attorney general filed suit against Mark and Sue Griffin, Alaska Charitable Gaming Association, Inc. (a member of Northern Lights and allegedly a "sham" organization controlled by the Griffin's), and various other corporate defendants (collectively, the "Griffins"). The attorney general's complaint, filed on behalf of the public and the member charities of the MBPs, alleged, among other things, that the Griffins had failed to turn over the statutory minimum percentage of gaming proceeds to Alaska Sports' member charities and that the Griffins had charged the member charities of the two MBPs inflated and excessive fees and rents.

After the attorney general filed his complaint, most of the affected charities were dismissed from the litigation at their own request. Three member charities of Alaska Sports obtained an order dismissing them

---

1. 660 P.2d 406 (Alaska 1982).

2. *See* AS 05.15.145.

3. Alaska Sports' original members were the Anchorage Sports Association, Inc., Triam Sports Association, Inc., Chugiak High School Boys' Basketball Booster Club, Bartlett High School Boys' Basketball Booster Club, and West High Athletic Alumni Association. West High Alumni Association was replaced by Mat Su Crime Stoppers, Inc., in 1996.

Northern Lights' original members were the Alaska Center for the Environment, Alaska Charitable Gaming Association, Inc., Alaska Laborers'

Training School, Barrier Free Recreation, and Mabel T. Caverly Senior Center, Inc. West High Alumni Association joined Northern Lights in 1996, and was dropped from membership in 1997 after complaining about an increase in the rent charged the charities.

The attorney general also brought suit on behalf of the three member charities of the Lucky Strike Bingo Joint Venture: Alaska Dance Theater, Inc., Cook Inlet Darting Club, and Victims for Justice. The record does not indicate that any of these three charities have withdrawn from the case, however.

from the case with prejudice.[4] Four member charities of Northern Lights obtained an order dismissing their claims without prejudice.[5] West High Alumni Association—originally a member of Alaska Sports, and later a member of Northern Lights—filed a notice of dismissal with prejudice. Of the Alaska Sports and Northern Lights member charities whom the attorney general had sought to represent, accordingly, all had withdrawn from the case except for the Anchorage Sports Association and Mat–Su Crime Stoppers.

In response to one or more of the Griffins' various motions for summary judgment, Superior Court Judge Dan A. Hensley held that this court's decision in *State v. First National Bank of Anchorage*[6] barred the attorney general from seeking monetary damages on behalf of any charity that had not given its consent to the suit. Accordingly, Judge Hensley issued an order barring the state from bringing damages claims on behalf of those charities that had "opted out" of the proceedings by dismissing their claims against the Griffins. The state appeals.

## III. *STANDARD OF REVIEW*

■ "This court will uphold summary judgment only if the record presents no genuine issues of material fact and 'the moving party was entitled to judgment on the law applicable to the established facts.' "[7] In making this determination, all reasonable inferences must be drawn in favor of the nonmoving party.[8] If in reviewing the summary judgment this court must answer questions of law, this court's duty is to "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[9]

## IV. *DISCUSSION*

### A. *Standing*

■ Preliminarily, the Griffins argue that the attorney general does not have standing to bring this suit, because the statutory power to police charitable gaming is entrusted exclusively to the Department of Revenue. We find this contention to be without merit.

■ "Generally, an attorney general has those powers which existed at common law except where they are limited by statute or conferred upon some other state official."[10] Under the common law, the attorney general has the power to bring any action which he thinks necessary to protect the public interest, a broad grant of authority which includes the power to act to enforce Alaska's statutes.[11] Alaska's statutes, in turn, give the attorney general the power to "prosecute all cases involving violation of state law, and file informations and prosecute all offenses against the revenue laws and other state laws where there is no other provision for their prosecution."[12] Although the Department of Revenue has the statutory authority to administer the provisions of AS 05.15, the state's gaming law,[13] and to issue orders prohibiting acts in violation of those provisions,[14] Alaska's statutes do not give the Department of Revenue the power to prosecute offenses against the gaming laws. The Department of Revenue's authority to proceed

---

**4.** Bartlett High School Boys' Basketball Booster Club, Chugiak High School Boys' Basketball Booster Club, and Triam Sports Association.

**5.** Alaska Center for the Environment, Alaska Laborers' Training School, Barrier Free Recreation, and Mabel T. Caverly Senior Center.

**6.** 660 P.2d 406 (Alaska 1982).

**7.** *Bishop v. Municipality of Anchorage*, 899 P.2d 149, 153 (Alaska 1995) (quoting *Newton v. Magill*, 872 P.2d 1213, 1215 (Alaska 1994)).

**8.** *See id.*

**9.** *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

**10.** *Public Defender Agency v. Superior Court*, 534 P.2d 947, 950 (Alaska 1975); *see* AS 44.23.020(b)(8) ("The attorney general shall … perform other duties required by law or which usually pertain to the office of attorney general in a state.").

**11.** *See Berger v. State, Dep't of Revenue*, 910 P.2d 581, 585 (Alaska 1996).

**12.** AS 44.23.020(b)(4).

**13.** *See* AS 05.15.010.

**14.** *See* AS 05.15.610.

administratively against gaming law offenses thus does not limit the attorney general's statutory and common law authority to bring suit to uphold the state's gaming laws.

### B. Consent

#### 1. Can the attorney general litigate a charity's claim against a third party without the charity's consent?

■ If the attorney general has the authority to assert a charity's damages claims against a third party, that power arises out of the attorney general's historical role in enforcing charitable trusts. Under Alaska law, a gaming operator's authorized expenses must be "bona fide [and] reasonably necessary" and may not exceed seventy percent of the adjusted gross income of pull-tab games or ninety percent of the adjusted gross income from non-pull-tab games.[15] The games' net proceeds, in turn, must be dedicated to "political, educational, civic, public, charitable, patriotic, or religious uses in the state."[16] By requiring a portion of the money spent on charitable gaming to benefit the public generally, Alaska's gaming laws create the effective equivalent of a charitable trust.[17] The attorney general has the power to sue to enforce charitable trusts on behalf of the trusts' beneficiaries,[18] who lack standing to pursue such a claim themselves.[19] When the trustees of a charitable trust divert a trust's property to purposes other than those for which it was given, the attorney general is thus the proper party to institute such proceedings as may be necessary to stop or redress the wrong.[20]

■ Under certain circumstances, the attorney general's authority to enforce charitable trusts gives him the power to prosecute on behalf of the ultimate charitable beneficiaries a charity's claim against a third party. So long as the charitable trustees fulfill their legal obligation to safeguard the interests of the trust's beneficiaries, there is ordinarily no need for the attorney general to involve himself in a charity's suit against a third party.[21] But if a charity's trustees dismiss or compromise a charity's claim against a third party for less than the charity is due under the state's gaming laws, the trustees are, in essence, disposing of the charity's property— i.e., disposing of the charity's cause of action—for a purpose other than that for which the property was given.[22] To prevent charitable trustees from improperly disposing of a charity's cause of action, the attorney general must be allowed to intervene to ensure adequate advocacy of the charity's claim.[23]

---

15. See AS 05.15.160(a), (c), (d).

16. AS 05.15.150(a).

17. See City of Palm Springs v. Living Desert Reserve, 70 Cal.App.4th 613, 82 Cal.Rptr.2d 859, 865–66 (1999) ("The elements essential to [the creation of a charitable trust include] ... a charitable purpose promoting the welfare of mankind or the public at large, of a community, or of some other class of persons which is indefinite as to numbers and individual identities.").

18. See Restatement (Second) of Trusts § 391 (1959) ("A suit can be maintained for the enforcement of a charitable trust by the Attorney General or other public officer ....").

19. See Arman v. Bank of America, N.T. & S.A., 74 Cal.App.4th 697, 88 Cal.Rptr.2d 410, 416 (1999) ("The Attorney General is the only party with standing to represent the intended beneficiaries of a charitable trust."); Restatement (Second) of Trusts § 391, cmt. d ("A suit for the enforcement of a charitable trust cannot be maintained by persons who have no special interest in the enforcement of the trust. The mere fact that as members of the public they benefit from the enforcement of the trust is not a sufficient ground to entitle them to sue, since a suit on their behalf can be maintained by the Attorney General.").

20. See Voelker v. Saint Louis Mercantile Library Ass'n, 359 S.W.2d 689, 694 (Mo.1962) ("[T]he Attorney General can maintain a suit to prevent a diversion of [charitable] property to other purposes than those for which it was given.").

21. See, e.g., Halladay v. Verschoor, 381 F.2d 100, 106 (8th Cir.1967) (holding that attorney general is proper, but not necessary, party to trustees' suit against third party).

22. The same could be true under other similar circumstances, e.g., if the charitable trustees simply ignored a potentially valid claim, or if the attorney general suspected ongoing collusion between the trustees and gaming operators.

23. See Voelker, 359 S.W.2d at 694.

Although it would be possible for the attorney general to sue the charitable trustees to compel *them* to sue the third party,[24] to require the attorney general to do so in this case would introduce unnecessary parties and thus unnecessary procedural complexities.[25] Accordingly, we hold that the attorney general's authority to enforce charitable trusts gives him the power to assert the charities' damages claims against the Griffins.[26]

Relying on this court's decision in *State v. First National Bank of Anchorage*,[27] the Griffins argue that the attorney general cannot pursue the charities' damages claims without the charities' consent. In *First National Bank*, however, the attorney general sought to litigate the damages claims of private individuals, not of charities.[28] Because the attorney general only had the authority to litigate those individuals' damages claims as their representative, we held that his power to litigate their claims was wholly dependent upon their consent.[29]

In litigating a charity's damage claim, however, the attorney general does not act as the representative of the charitable trustees.[30] The attorney general represents, instead, the interests of the charitable beneficiaries.[31]

Because the attorney general's authority to litigate a charity's damage claim is not derived from his role as the charitable trustees' representative, his power to litigate such a claim is not dependent upon the charitable trustees' consent.

Although the Griffins' alleged wrongdoing may have involved a breach of their duties to specific charitable permittees, those charitable organizations cannot unilaterally waive the Griffins' obligation to obey the state's gaming laws. As a New York court stated, in imposing restrictions on the conduct of a professional organization raising funds for charitable groups,

> The fact that [the charities] expressly agreed to the terms of the contracts should not preclude the Attorney General from protecting the public's rights in this situation. The contracts with the non-profit organizations are not merely bilateral, but rather establish a triangular relationship with the public as the third party whose interests should be protected.[32]

The Griffins' involvement in the charities' gaming operations also creates a "relationship with the public," whose interests the attorney general may protect in the event that the affected charities do not.

**24.** *See* Restatement (Second) of Trusts § 392, cmt. a ("A suit in equity can be maintained by the Attorney General to compel the trustees of a charitable trust to perform their duties as trustees....").

**25.** *See* Part IV.C, *infra*.

**26.** *See In re Estate of Horton*, 11 Cal.App.3d 680, 90 Cal.Rptr. 66, 68–69 (1970) (holding that attorney general has no broad right to participate in charity's contractual undertakings, but has the right to attack a trust's compromise agreement by alleging abuse of trust management); *People ex rel. Scott v. Police Hall of Fame, Inc.*, 60 Ill.App.3d 331, 17 Ill.Dec. 519, 376 N.E.2d 665, 670–71 (1978) (holding that where charity compromised its claim against corporate fund raisers who had retained unlawfully high percentage of charitable contributions, attorney general had right to sue for damages); *Lefkowitz v. Lebensfeld*, 51 N.Y.2d 442, 434 N.Y.S.2d 929, 415 N.E.2d 919, 922 (1980) (holding that attorney general may have standing to sue in place of charitable trustees if trustees refuse demand to institute such a suit themselves); *Brown v. Concerned Citizens for Sickle Cell Anemia, Inc.*, 56

Ohio St.2d 85, 382 N.E.2d 1155, 1157 (1978) (holding that where charity did not protest the retention of all bingo proceeds by game's operators, attorney general's authority to sue to enforce charitable trusts gave him authority to maintain suit for damages against operators).

**27.** 660 P.2d 406 (Alaska 1982).

**28.** *See id.* at 416–17.

**29.** *See id.*

**30.** *See Murphey v. Dalton*, 314 S.W.2d 726, 731 (Mo.1958) ("The plain fact is, the attorney general is not and, in many instances, could not properly be the attorney for the trustee of a public charitable trust. He is the attorney for the public, not the attorney for the trustee." (italics omitted)).

**31.** *See id.*

**32.** *State v. Francis*, 95 Misc.2d 381, 407 N.Y.S.2d 611, 614 (N.Y.Sup.Ct.1978), *aff'd*, 67 A.D.2d 640, 412 N.Y.S.2d 340 (1979).

**2.** *Did the affected charities dismiss or compromise their claims against the Griffins for less than they were due under the state's charitable gaming laws?*

■ The attorney general's complaint alleged, among other things, that the Griffins failed to turn over the statutorily defined minimum percentage of gaming revenues to the Alaska Sports member charities and that the Griffins charged the member charities of the two MBPs inflated and excessive fees and rents.

Evidence to support the state's first allegation is provided by the sworn affidavit of Jeff Prather, an employee of the Department of Revenue, who testified that the Griffins failed to turn over the required statutory percentage of their gaming proceeds to the Alaska Sports member charities—a deficit which neared $500,000.

There is also evidence from which to infer that the Griffins charged the Northern Lights member charities unreasonably high, and thus statutorily prohibited, fees and rents. In their defense, the Griffins argue that *all* of the affected charities agreed that the fees and rents were reasonable. But this is not uncontested. West High Alumni Association complained about the increased rent charged the charities. Further, it was expelled from the Northern Lights Gaming Co-Op after doing so. Although Northern Lights' minutes suggest that West High Alumni Association's membership in the MBP was terminated as a cost-saving measure, on summary judgment all reasonable inferences must be drawn in favor of the state.[33] The timing and circumstances of West High Alumni Association's expulsion, including the presence and participation of the Griffins' personal attorney at the board meeting at which it occurred, support an inference that the Griffins were retaliating against charities that complained that the Griffins' fees were too high.

Northern Lights' joint venture agreement, moreover, gave the Alaska Charitable Gaming Association the right to expel any non-sponsoring member charity from the MBP.

Given the evidence that the Alaska Charitable Gaming Association was a sham organization controlled by the Griffins, it is not unreasonable to infer that any other charity which agreed to the fees charged by the Griffins did so out of fear that it, too, would be subject to retaliation if it did not.

With the possible exception of West High Alumni Association, there is no evidence that any of the affected charities received any compensation for withdrawing their claims against the Griffins. Although West High Alumni Association settled its claim, the Griffins presented no evidence as to the *value* of that settlement. West High Alumni Association was apparently insolvent, and there was evidence that the Griffins used the threat of adverse attorney's fees awards to persuade charities to withdraw from the case against them. Under these circumstances, it is reasonable to infer that West High Alumni Association, too, received little or nothing in return for settling its claim.

As the attorney general has the authority to assert a charity's cause of action against a third party if that claim was dismissed or compromised for less than the charity was due to receive under the state's charitable gaming laws, and there was evidence in the record that the affected charities received less than they were due in exchange for dismissing or compromising their claims against the Griffins, the superior court erred in granting summary judgment against the state.

**C.** *Should the Charities Be Joined Under Civil Rule 19(a)?*

■ The parties agree that the charities that have opted out of the case are not necessary parties. After analyzing Civil Rule 19(a) in the context of this case, we reach the same conclusion.

Under Civil Rule 19(a), a party whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined if:

(1) in the person's absence complete relief cannot be accorded among those already parties; or (2) the person claims an inter-

---

**33.** *See Bishop v. Municipality of Anchorage,* 899 P.2d 149, 153 (Alaska 1995).

est relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest, or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

In this case, joinder is not compelled by Rule 19(a)(1); the only monetary relief sought is compensation from the Griffins, which can be obtained without the charities' participation.[34]

Joinder is also not compelled here by Rule 19(a)(2)(i). In a case interpreting Rule 19(a)(2)(i), this court held that "if the beneficiary's interest will not as a practical matter be impaired by the trustee's absence, then neither the trustee nor the beneficiary are necessary parties."[35] Although the interests of a *private* trust's beneficiary generally cannot be protected in the absence of both the trustee and the beneficiary,[36] here the situation is different. The trustees of the charities in question have abandoned or compromised their legal claims against the Griffins, claims which the attorney general still seeks to advance. Because the attorney general will adequately represent the interests of the beneficiaries, the trustees' absence does not impair the beneficiaries' interests. Accordingly, the trustees of the charities are not necessary parties under Rule 19(a)(2)(i).

Joinder is also not compelled by Rule 19(a)(2)(ii). Because Rule 19(a)(2)(ii) only applies to parties who "claim[ ] an interest relating to the subject of the action," it applies neither to parties expressly disclaiming an interest in an action[37] nor to parties who remain silent despite an opportunity to join an ongoing action.[38] Those charities that have had their claims dismissed with prejudice have expressly disclaimed an interest in the ongoing litigation, and those charities that have had their claims dismissed without prejudice have chosen to remain silent despite their opportunity to join an ongoing action. Accordingly, joinder of neither group is necessary under Rule 19(a)(2)(ii).

## V. CONCLUSION

Where a charity dismisses or compromises a claim against a third party for less than it is due to receive under the state's gaming laws, the attorney general's authority to enforce charitable trusts gives him the power to assert the charity's cause of action. Drawing all reasonable inferences in favor of the state, the merit of the charities' claims against the Griffins presents, at a minimum, a genuine issue of material fact. Accordingly, we hold that the attorney general may pursue a damages claim against the Griffins without the consent of the affected charities, and REVERSE the superior court's grant of summary judgment.

FABE, Chief Justice, not participating.

**34.** See *Martech Constr. Co. v. Ogden Environmental Servs., Inc.*, 852 P.2d 1146, 1154 (Alaska 1993) ("[I]t must be noted that complete relief refers to relief as between the parties already parties, and not as between a party and the absent person whose joinder is sought." (quoting 3A *Moore's Federal Practice* ¶ 19.07–1[1], at 19–93–96 (2d ed.1991))).

**35.** *Matter of Pacific Marine Ins. Co. v. Harvest States Coop.*, 877 P.2d 264, 269 (Alaska 1994).

**36.** See *id.*

**37.** See *Boczon v. Northwestern Elevator Co.*, 652 F.Supp. 1482, 1486 (E.D.Wis.1987).

**38.** See *ConnTech Development Co. v. University of Connecticut Educ. Properties, Inc.*, 102 F.3d 677, 683 (2d Cir.1996) (holding that party that has "clearly declined to claim an interest in the subject matter of th[e] dispute" is not a necessary party); *Gateway Associates, Inc. v. Essex–Costello, Inc.*, 380 F.Supp. 1089, 1095 (N.D.Ill.1974).